# EXHIBIT I

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL

| | |
|---|---|
| In the Matter of the Arbitration Between ) | |
| ) | |
| RBC NICE BEARINGS, INC., ROLLER ) | AAA # 14 152 01622 09 |
| BEARING COMPANY OF AMERICA ) | |
| INC., and ROLLER BEARING ) | |
| COMPANY OF AMERICA, d/b/a NICE ) | |
| BALL BEARINGS, INC. ) | |
| ) | |
| Claimants, ) | |
| ) | **FINAL AWARD AND ORDER** |
| and ) | |
| ) | |
| SKF USA INC., ) | |
| ) | |
| Respondent. ) | |

Before:
      Hon. Arlin M. Adams, Chairman
      Hon. George C. Pratt, Arbitrator
      Hon. E. Norman Veasey, Arbitrator

ADAMS AND VEASEY, ARBITRATORS, FOR THE MAJORITY:

### BACKGROUND

#### *Prior Proceedings*

In our unanimous Interim Award and Order dated March 25, 2011 ("Interim

Award"), the Panel determined that, by their Asset Purchase Agreement ("APA"), the

parties had created a "special relationship" when SKF[1] transferred to RBC all of its right,

title, and interest in and to the product designations ("Series designations") included in

---

[1] The Identities and descriptions of the parties and other matters as set forth in the Interim
Award are continued in this Final Award and Order.

the Nice product catalog. RBC had bought the Nice business from SKF, including the

Series designations in the Nice catalog. SKF agreed in the APA to sell to RBC:

> all the assets, ... rights, ... claims, of every kind and description ...,
> whether tangible or intangible, ..., that are used [or] owned by [SKF] in
> connection with the Business ... including without limitation all right title
> and interest of [SKF] in and under the following ...:
>
>> (i) all of [SKF's] patents, copyrights, trademarks ... and
>> other proprietary data;
>>
>> (m) all goodwill associated with the Business or the
>> Transferred Assets; [and]
>>
>> (n) all product designations used in SKF's catalog with
>> respect to the Products ..."[2]

In APA § 3.09 SKF represented and warranted to RBC that it had "the right to sell,

assign, transfer and convey" to RBC "all of the Transferred Assets free and clear of all

Liens ...."

Accordingly, in the Interim Award, the Panel held: "Because of that 'special

relationship,' under which SKF divested itself of any interest in or right to use the

product designations, the Panel concludes that after the APA, SKF no longer had any

right to use or interest in the product designations and that SKF's subsequent opposition

to RBC's efforts to obtain trademark protection was inconsistent with its obligations to

RBC under the APA."[3]

The Panel then ordered that "SKF withdraw all oppositions to RBC's trademark

applications that it has previously filed, and is further enjoined from any participation in

---

[2] APA § 2.01.

[3] Interim Award at 7.

the future in any PTO proceedings with respect to RBC's existing or future applications for trademark registration of product designations included in the Nice catalog referred to in the APA." The Panel also held that "RBC is entitled to be indemnified by SKF for its expenses in defending against SKF's oppositions to RBC's trademark applications to the PTO..."[4]

Further, in the Interim Award, with respect to RBC's request for relief against SKF based on the conduct of Peer and other bearing manufacturers, the Panel held that "[t]he record remains open for the purpose of receiving further evidence and argument from both sides on the issue of whether SKF's relationship to Peer is such as to warrant further relief against SKF based on Peer's conduct toward RBC."[5] It is this issue that the Panel now addresses.

### Peer Issue As Discussed in the Interim Award

In leaving open the question whether RBC is entitled to further relief against SKF based on certain activities of Peer, the Panel outlined the then-known facts and described this issue as follows:

> Whether the relief to be granted should result from Peer's conduct presents more difficult questions, particularly because (1) Peer was apparently using the product designations both when the APA was signed in 1997 and when SKF acquired Peer in 2008, and (2) RBC has apparently lost its entire action against Peer in the Connecticut District Court (the 1600 Series by adjudication of laches, and the other series by RBC's withdrawal with prejudice), with the result that Peer apparently would have the right to use the product designations at issue in that suit even if the PTO should ultimately grant RBC's applications.

---

[4] *Id.* at 12-13.

[5] *Id.*

3

When SKF sold its interest in the product designations to RBC in 1997, Peer was using those designations. Not until nine years later, in 2006, did RBC bring suit against Peer for infringement of RBC's rights to the designations. The suit ended in 2010 with a dismissal with respect to the SERIES 1600 designation on the ground of laches, and a voluntary dismissal with respect to the other designations at issue in the case. While the circumstances of the Peer adjudication did not create any collateral estoppel effect against RBC with respect to RBC's trademark rights as against other possible users of the product designations, it did determine that RBC may not prevent Peer from continuing to use the product designations in issue in that case. In short, whatever trademark rights RBC might have in the product designations, it is not able to enforce those rights against Peer.

A problem for this arbitration is created by the fact that in 2008, while RBC's action against Peer was pending, SKF acquired Peer as a wholly owned subsidiary. This raises the question of whether SKF is responsible for Peer's conduct after the acquisition.

RBC contends that because of certain express provisions in the APA and by virtue of the good-faith-and-fair-dealing clause that is implied in every contract, once SKF had acquired Peer, it had the contractual duty to require Peer to conform to the same obligations toward RBC that SKF had with respect to the product designations. On this theory, RBC seeks to enjoin SKF from allowing Peer to continue to oppose RBC's PTO applications, and to enjoin SKF from allowing Peer to continue using the product designations. RBC also seeks to be indemnified by SKF for its costs incurred since 2008 in defending against Peer's continued opposition to RBC's PTO applications.

Understandably, the APA did not contain any provision that would have prevented SKF from competing with RBC, because at the same time SKF was agreeing to become RBC's exclusive distributor for certain products. Whatever the reason for there being no non-compete provision in the APA, the absence of such a provision left SKF free to compete freely with RBC once the Sales and Supply Agreement was terminated in 2006. After the termination, the only limitation on SKF's ability to compete with RBC was that SKF had no right to use the product designations in the Nice catalog referred to in the APA, having transferred all of those rights to RBC under the APA.

Peer, on the other hand, was using the product designations long before it was acquired by SKF. The Panel has thus far not been provided with evidence that would warrant sanctioning SKF for its control of Peer after it became Peer's parent. RBC asserts, however, that the SKF/Peer

acquisition agreement that was belatedly produced only during the hearing, plus other, related evidence of SKF's control of Peer is the very evidence for which the hearing was to be left open. Therefore, until RBC has a fair opportunity to present that additional evidence and SKF has a fair opportunity to respond, the Panel is unable to rule on RBC's claims for relief against SKF based on what Peer did or did not do. Because some of the opposition by the other manufacturers may have been caused by SKF acting through Peer, determination of any indemnification for those expenses is also left for the final award to be entered after completion of the additional proceedings contemplated by this Interim Decision.[6]

After the Panel issued its Interim Award, the parties engaged in further discovery on the Peer issue. The Panel held an evidentiary hearing on September 7-8, 2011, at which the parties adduced evidence on the relationship between SKF and Peer and on certain of RBC's costs. After receiving post-hearing memoranda, the Panel heard final oral argument on January 18, 2012. This is the Final Award and Order of the Panel.

## SUMMARY OF THE CONTENTIONS OF THE PARTIES RELATING TO RBC'S APPLICATION FOR FURTHER INJUNCTIVE RELIEF

RBC contends that, because SKF has the power to control Peer and, whether or not it has exercised that power, as a matter of equity and fair dealing, additional injunctive relief against SKF should be ordered to prohibit "SKF from doing indirectly through Peer that which it cannot do directly under the APA."[7]

SKF, of course, contests RBC's contentions with respect to the facts, the law, and the equities. SKF emphasizes: the corporate separateness of Peer and SKF and their independent operation, despite SKF's ability to control Peer; Peer's conduct challenged by RBC long predates the SKF's acquisition of Peer; SKF itself is not using the Series

---

[6] *Id.* at 12.

[7] *See, e.g.*, RBC Opening Brief (ROB) at 12.

designations or interfering with RBC's trademark efforts, nor has SKF exercised its control over Peer in any way involving the conduct challenged by RBC; and RBC has not satisfied the requirements for piercing the corporate veil or otherwise proving that Peer is the alter ego of SKF.[8]

As set forth above, this Panel found in its Interim Award that "(1) Peer was apparently using the product designations both when the APA was signed in 1997 and when SKF acquired Peer in 2008; and (2) RBC has apparently lost its entire action against Peer in the Connecticut District Court ... When SKF sold its interest in the product designations to RBC in 1997, Peer was using those designations ...."[9]

Nevertheless, RBC seeks to prevent SKF "from allowing Peer to breach the APA."[10] If this request were granted, the Panel would have to order SKF to exercise its previously unexercised control over Peer to cause it to discontinue a course of business conduct in which it had long been engaging. Specifically, the relief RBC seeks would constitute a mandatory injunction directing SKF: (a) to stop Peer from opposing RBC's trademark efforts with respect to the product designations included in the Nice catalog; and (b) to stop Peer from using the product designations.[11]

To support this request for a mandatory injunction, RBC claims that Peer's action opposing RBC's trademark efforts and its use of the product designations results in SKF

---

[8] See, e.g., SKF Answering Brief (SAB) at 1-2.

[9] Interim Award at 10.

[10] ROB at 1.

[11] Id.

6

"doing indirectly through Peer that which it cannot do directly under the APA."[12]  In support of its contentions and prayers for injunctive relief, RBC asserts that the record shows "the overwhelming control SKF asserts over" its wholly-owned subsidiary Peer, and that SKF has "substantial involvement in Peer's overall and day-to-day business affairs."[13]

As some of the evidence of SKF's power to control Peer, RBC points to the facts that Peer's senior management and its board of directors include a number of current or former executives of SKF or its affiliates; the board changed Peer's bylaws; SKF's personnel on Peer's board and in its executive offices advised Peer on its corporate strategy, such as business opportunities, inventory control, and the like; SKF asserted with Peer a community of legal interest in the Peer litigation against RBC; and SKF controlled Peer's financial and tax affairs.[14]

RBC's legal argument is, essentially, that by possessing control over Peer, SKF is "circumventing" its obligations under the APA through Peer's activities and thus SKF would keep for itself the very assets it sold to RBC.  RBC maintains, however, that this is not a veil-piercing case because RBC does not seek to "reach the assets" of one entity to remedy some wrong that another entity committed against RBC.  Instead, RBC's central argument is that SKF's inaction in not stopping Peer is inequitable and violates the implied covenant of good faith and fair dealing in the APA.  Further, RBC argues that, even if this were a veil-piercing case, it should prevail because of SKF's control over

---

[12] *Id.*

[13] *Id.* at 2-4.

[14] *Id.* at 5-15.

7

Peer and the principle that the veil-piercing and alter ego doctrines are grounded in equity.[15]

SKF disputes much of the above and contends that:  (a) Peer is a separate juridical entity that is not dominated and controlled by SKF; (b) to the extent SKF has the power to control Peer, it has not exercised that power in relation to the conduct challenged by RBC, including the fact that it is primarily Peer personnel, not SKF personnel, who continue, post-acquisition, to be responsible for managing Peer's day-to-day business operations; (c) Peer has been in the bearing business for many years predating the APA; (d) Peer operates independently of, and even in competition with, SKF; (e) Peer and SKF sell different quality bearings; (f) Peer has used Series designations since the early 1960s; (g) Peer contested RBC's trademark efforts before SKF acquired Peer; (h) Peer is not a party either to the APA or this arbitration; (i) no provision in the APA reaches the activities of Peer; and (j) RBC would be obtaining broad relief for which it did not bargain if this Panel were to order SKF to cause Peer to stop what it has been doing for years.[16]

---

[15] *Id.* at 17-23.  In addition to the injunctive relief it seeks, RBC seeks indemnification from SKF for its fees and expenses in defending trademark applications before the US PTO. *Id.* at 23-24.  For reasons stated hereafter, we need not reach the question of indemnification.

[16] SAB at 22-40.  Also, SKF denies that RBC is entitled to any indemnification for its expenses (which SKF also contends are excessive). *Id.* at 41-45.  Finally, SKF seeks reconsideration of the Panel's Interim Award. *Id.* at 46-52.  The Panel sees no basis to reconsider the Interim Award, particularly at this late date and in the context of the matters currently before the Panel.

8

## SUMMARY OF THE CONCLUSION OF THE MAJORITY OF THE PANEL

Based on the fact that the Panel has ruled that SKF may not use the Series designations or oppose RBC's trademark quest, RBC asks this Panel affirmatively to order SKF to stop Peer from using the designations and to stop Peer from interfering with that quest and from using the designations. The majority of the Panel has concluded that RBC's argument is a non sequitur and should be denied, based on the facts and the law.

As set forth below, Pennsylvania law requires a "clear right to relief" for the "extreme" remedy of a mandatory injunction. Under the circumstances presented in this case, the majority finds no basis for entering an unprecedented and extraordinary mandatory injunction ordering SKF to direct Peer to stop using the Series designations or opposing RBC's efforts at the USPTO. This is a contract case, and the Panel is called upon to interpret, not re-write, the parties' contract.

The APA is a comprehensive, integrated, commercial contract between sophisticated parties, comprising 47 single-spaced pages plus schedules and exhibits of another 48 pages. Despite the absence of *express* provisions in the APA mandating its decision, the Panel in its Interim Award has already significantly extended the provisions of the APA by finding that the APA includes an implicit term—a "special relationship" based on the notion that SKF sold for valuable consideration the entire business and cannot take it back. But this interpretation of RBC's contract rights, as found by the Panel, extended only so far as the relationship between RBC and SKF. There is no express provision in the comprehensive APA extending to any of SKF's after-acquired subsidiaries the restrictions imposed on SKF. The Panel's Interim Award found no

9

implied provision to that effect, and the majority finds no such provision that can reasonably be implied here under the facts in this record.

We have heard no evidence that trademark possibilities for the Series designations were ever the subject of pre-closing discussion or negotiation leading up to the APA. Uncontradicted evidence in the record does, however, support a finding that SKF acquired Peer in 2008, long after Peer had been using the Series designations, long after the 1997 APA, and also after Peer had begun opposing RBC's trademark efforts. Moreover, the acquisition was premised on the business plan of SKF USA, Inc. and its parent, AB SKF, to augment SKF's high quality, high price, ball bearing product line by entering the medium-quality, medium-priced market. Despite Peer's status as a wholly owned subsidiary of SKF, however, Peer continues to operate independently of — and in partial competition with — SKF. Peer, not SKF, was (and remains) solely responsible for its day-to-day operations.[17]

In this arbitration, RBC—one sophisticated party to the 1997 comprehensive, integrated, commercial APA—seeks to persuade the Panel to extend the terms of the APA to imply yet another new term. That new term would reach Peer, a non-party to the APA, by resulting in the issuance of a mandatory injunction requiring the only other party to the APA—SKF—to cause Peer to change its conduct.

---

[17] *See* text and record references marshaled in SKF's Opening Brief at 7-12; *see also* transcript of January 18, 2012, oral argument ("TR") at 48-54. RBC significantly overstates this record in several ways, including its unsupported statement that the record "demonstrates the overwhelming control SKF exerts over Peer" and that "SKF executives are also heavily involved in controlling Peer's day-to-day operations." (ROB at 3).

The sole grounds on which RBC rests its request for such an unprecedented and extraordinary mandatory injunction from this Panel are: (1) SKF's acquisition of the stock of Peer, as a wholly owned subsidiary of SKF, after the APA; (2) SKF's resulting possession of power to control Peer (although SKF has not exercised that power in a manner related to the conduct challenged by RBC), and (3) RBC's claim that "allowing" Peer to continue its historic activities would be "unfair" or "inequitable" to RBC, by allowing SKF to do indirectly (through Peer) that which it cannot do directly.

The thrust of RBC's contentions and the view of the dissent is that, when SKF acquired Peer and became the owner of all of its stock, it thereby subjected Peer to the same restrictions vis-à-vis RBC that applied to SKF under the APA. Therefore, the argument goes, SKF could not, through its wholly owned subsidiary, Peer, engage in and reap the benefits of, conduct that was off limits to SKF, even though, pre-acquisition, Peer had engaged in the identical conduct.

RBC acknowledged that it is undisputed that SKF has not actually exercised control over Peer with regard to Peer's use of the Series designations and opposition to RBC's trademark efforts. Nevertheless, RBC contends that it is undisputed that SKF *could* prevent Peer from doing those things, and has deliberately refrained from doing so.

Finally, RBC and the dissent conclude essentially as follows: What controls the outcome here are the undisputed *consequences* — namely, that SKF *benefits* indirectly as the owner of all of Peer's stock through Peer's use of the designations and its opposition to RBC's trademark efforts. Therefore, the essence of RBC's claim is that SKF is *doing* indirectly what it cannot do directly. But the majority of the Panel concludes that RBC's contention does not follow from its premise.

The short answer to these contentions is that SKF is *not* "doing" what RBC claims. SKF is not taking *any* affirmative action. SKF is not altering what Peer had been doing before it was acquired by SKF. Moreover, it is not clear what are the "benefits" to SKF, other than the presumed indirect financial benefits that a parent ball bearing company would have from owning a subsidiary that uses Series designations. There was no evidence adduced by RBC that would quantify the vague notion that SKF benefitted from Peer's use of the product designations or the opposition to RBC's trademark quest. SKF is not gaining the benefit of using Series designations for SKF-branded products by its direct furtherance of the use of the Series designations. Peer's use of those designations is the same as it has always been and the same is true for its opposition to RBC's trademark efforts. That is, Peer's current actions do not change the competitive environment that pre-existed SKF's acquisition of Peer.

In the view of the majority, it is the grant of the requested injunction, not its denial, that would imbalance the inequities. RBC is attempting an end run around trademark law through an argument that conflates trademark-type concerns with contract law principles, which would be distorted by an undue expansion of RBC's rights under the express or reasonably implied terms of the APA.

In short, the injunction sought by RBC cannot responsibly be based solely on the "consequences" of what Peer has been doing or the presumed indirect benefits to SKF. What Peer has been doing, long before SKF acquired it, is *not* what SKF is doing. To say that Peer's doing is SKF's doing is to beg the very question this Panel is called upon to decide. What needs to be shown is that Peer is SKF. That is, Peer is SKF's alter ego. The facts show otherwise.

RBC would have the Panel set aside or diminish the central and *undisputed* facts of this case, which not only do not support *any* right to relief, but also fall far below the Pennsylvania standard requiring that a request for the "extreme" remedy of a mandatory injunction, which is rarely granted, must be established by showing a "clear right to relief." That clear right to relief has not been shown, and the undisputed facts in this record showing otherwise include the following:

(1)  Peer used the Series designations *well before* the 1997 APA between SKF and RBC and *well before* SKF acquired the stock of Peer;

(2)  Peer opposed RBC's trademark efforts before SKF acquired Peer;

(3)  Peer is not a party to the APA or to this arbitration and there is no provision in the APA reaching Peer or imposing SKF's restrictions on its affiliates;

(4)  Since being acquired by SKF, Peer has not been doing anything vis-à-vis the Series designations or RBC's USPTO proceedings that is more than or different from what it has historically done;

(5)  SKF's acquisition of Peer does not alter the extent of any injury (if indeed there is any injury) to RBC as a result of Peer's conduct;

(6)  SKF acquired Peer in the exercise of SKF's and its parent company's business judgment to gain the benefits of Peer's expertise and market share in the medium-quality, medium-price bearing market, while SKF's business has concentrated on the high-end bearing market;

(7)  There is no evidence that SKF acquired Peer in order to circumvent the APA;

(8)  SKF has not engaged in, or interfered with, Peer's day-to-day business operations;

(9)  SKF and Peer operated in different markets, independently of each other, and in partial competition with each other;

13

(10)  Although SKF has the power to control Peer, there is no evidence that SKF has exercised its control over Peer in connection with the use of the Series designations or the opposition to RBC's USPTO efforts;

(11)  The senior officers who carry out the day-to-day, operational management of Peer's business are not SKF employees; all four of the senior executives of Peer who manage its day-to-day operations, including Peer's chief executive officer, are Peer employees, not SKF employees, and only one of them has ever been employed by any SKF-affiliated company;[18]

(12)  Although the five-person Peer board of directors includes three people who are employed by SKF or its affiliates, the board does not control Peer's day-to-day management of the business;[19]

(13)  SKF and Peer have exercised proper corporate procedures that are expected of parent and subsidiary corporations (e.g. separate boards, corporate documents, proper minutes, accounting, capitalization, and the like);

(14)  There is no evidence whatsoever that SKF has operated or now operates Peer as an "alter-ego," or as a "sham" to circumvent or evade the APA.

In addition to requiring the Panel to ignore the above facts, granting RBC the relief it seeks would require the Panel to substitute its notion of what is "fair" and "equitable" for the bargained-for terms of a contract negotiated between sophisticated commercial parties.

After carefully reviewing the record, briefs, oral argument, and applicable authorities, the majority has concluded, on balance, that RBC has not demonstrated a "clear right" to the relief it seeks, and that SKF has the better of the argument on the

---

[18] *See* Tr. 50-53.  Other Peer officers, who fulfill corporate governance-oriented roles such as Secretary and Assistant Treasurer, are employees of SKF.  See *supra* note 17, noting RBC's overstatement of the record regarding Peer's day-to-day business operations.

[19] *Id.* at 54-55.

14

matter currently before the Panel.  Therefore, the majority of the Panel will not take the extraordinary step of ordering the mandatory injunctive relief sought by RBC.

## LEGAL DISCUSSION

### *Pennsylvania Standard for a Mandatory Injunction*

A party seeking a mandatory injunction—an "extreme" remedy[20] that "command[s] the performance of some positive act"—must satisfy a very high burden, and mandatory injunctions are rarely granted.[21]  The Pennsylvania Supreme Court has stated that mandatory injunctions should be issued "more sparingly" than injunctions that are "merely prohibitory," and that a party seeking a mandatory injunction must establish a "clear right to relief."[22]

### *Discussion of the Merits*

RBC has not satisfied its burden of showing a "clear right" to the "extreme" remedy of a mandatory injunction ordering SKF to direct Peer to refrain from using the Series designations or opposing RBC's efforts in the USPTO.  The parties have not cited, and the Panel has not independently found, a comparable case.  That is, we have found no case where one party to a contract (which is silent on the point in question) seeks injunctive relief — let alone mandatory injunctive relief — against the other party to

---

[20] *Big Bass Lake Cmty. v. Warren*, 950 A.2d 1137, 1145 (Pa. Commw. Ct. 2008).

[21] *Mazzie v. Commonwealth*, 432 A.2d 985, 988 (Pa. 1981).

[22] *Id.*; *see also Sovereign Bank v. Harper*, 674 A.2d 1085, 1092 (Pa. Super. Ct. 1996) ("Because a mandatory injunction compels the defendant to perform an act, rather than merely refraining from acting, courts will only grant a mandatory injunction upon a very strong showing that the plaintiff has a 'clear right' to relief.").

15

cause it to terminate conduct of the latter party's after-acquired, wholly-owned subsidiary where the subsidiary is not a party to either the contract or the tribunal's proceeding and its unchanged, continuing conduct that predated the contract.

As noted above, long before it was owned by SKF, Peer had been using the product designations (as have others in the bearing business) and it had opposed RBC's trademark efforts (as have others in the bearing business). In the Interim Award, the Panel ordered SKF itself not to engage in these activities directly because the Panel found, by implication in this very ambiguous contract, that a "special relationship"[23] existed between SKF and RBC. As a result, the Panel ruled that SKF divested itself of the Nice business and product designations it sold to RBC. But the question that remains and that is now before the Panel is the following: why should SKF be ordered to cause Peer to stop what it has been doing?

Peer uses and has been using Series designations for decades. SKF had also been using the designations when it sold the Nice business to RBC and entered into the APA. There is no evidence—and no reason to believe based on the contract itself—that RBC thought it was purchasing from SKF the designations used by Peer. SKF did not have any "right, title, [or] interest" in Peer's use of the designations that it could sell.[24] Hence, Peer's entitlements were unaffected by the APA, as interpreted in the Interim Award.

---

[23] Interim Award at 7.

[24] APA § 2.01.

RBC claims that it is not seeking a traditional veil-piercing analysis.[25]  Instead, it argues that equitable considerations compel the result it seeks.  As the Panel understands this argument, it has two components.  The first component is the argument that the Panel should apply equitable considerations to prevent SKF from using Peer to "circumvent" the Panel's Interim Award.  The second component is related to the first and rests on the implied covenant of good faith and fair dealing.

As to the general equitable argument, RBC basically contends that SKF should not be entitled to do indirectly what it cannot do directly and that an injunction will restore RBC to "the value of its purchase."[26]  RBC relies primarily on two cases:  *Guth v. Guth Chocolate Co.*[27] and *Levitt Corp. v. Levitt.*[28]  Both cases are significantly distinguishable and do not support RBC's argument under these facts.  And cases of this genre are inherently fact intensive.

*Guth* and *Levitt* each involved a seller who had sold the use of his name for the purpose of selling a product, and then later used or permitted the use of his name in the

---

[25] ROB at 22.  Indeed, in this context, applying a veil-piercing analysis to assert an alter ego theory would be particularly unusual, because it would involve "downstream" piercing—that is, it would be seeking to obtain a remedy that would affect the conduct of the subsidiary, Peer, based on an alleged violation of an obligation by the parent, SKF.  Downstream veil piercing is more controversial and less frequently applied than "upstream" veil piercing.  *See, e.g.,* Michael Richardson, Comment and Casenote, *The Helter Skelter Application of the Reverse Piercing Doctrine,* 79 U. CIN. L. REV. 1605, 1606, 1615-16 (2011).

[26] ROB at 18.

[27] 224 F. 932 (4th Cir. 1915).

[28] 593 F.2d 463 (2d Cir. 1979).

promotion of a competing venture.[29] The *Levitt* court, like the *Guth* court, held on the specific facts before it that injunctive relief was warranted to prevent a seller of the name and goodwill of a business from "arrogat[ing] to himself the trade reputation for which he received valuable consideration."[30]

Those situations are different from the situation here which involves materially different facts and legal principles. In the case before us, SKF sold to RBC its interest in using the Series designations. Then SKF later acquired Peer, which, before the acquisition, had been using Series designations to sell Peer products for decades and had also opposed RBC's efforts before the USPTO. SKF's ownership of Peer does not change the landscape in which Series designations are being and have been used following SKF's sale of its use of Series designations to RBC in the APA. There is no evidence in this record that SKF created or acquired Peer to evade SKF's obligations under the APA. If the Panel were to order SKF to cause Peer to stop using Series designations or cease resistance to RBC's trademark efforts, however, RBC would get more than it bargained for in the APA.

As to the implied covenant of good faith and fair dealing, RBC has not cited a comparable case or adduced proof that SKF acquired Peer to "evade the spirit of the bargain" between RBC and SKF or that it was dishonest or engaged in bad faith

---

[29] *Levitt*, 593 F.2d at 466; *Guth*, 224 F. at 934.

[30] *Levitt*, 593 F.2d at 468.

conduct.[31] Here the facts show that SKF acquired Peer in good faith and endeavored to permit it independently to operate much as it had previously.

It is well established that only parties to a contract are bound by the contract.[32] In *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*,[33] the Delaware Court of Chancery applied this principle and rejected common control as a basis for finding that a party to a merger agreement, Aladdin, had a duty to cause its affiliate that was not a party to the agreement to take certain actions to facilitate the closing of the merger.[34]

---

[31] *See Donahue v. Federal Express Corp.*, 753 A.2d 238, 242 (Pa. Super. Ct. 2000) ("Good faith has been defined as 'honesty in fact in the conduct or transaction concerned.'"); *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) (describing bad faith in the performance of contractual duties as including "evasion of the spirit of the bargain").

[32] *See, e.g., First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 603 (Pa. Super. Ct. 1991) ("The law in Pennsylvania is clear that where a party enters into a contract with a corporation, no action will lie against the shareholders of that corporation individually for a breach of that contract '[T]he breach of the contract is the breach of a promise made by the corporation, and not the breach of any promise extended by the corporation officer.' Shareholders, officers and directors are not held liable for the corporation's breach of a contract, absent an establishment of participation theory or the successful assertion of the equitable doctrine of piercing the corporate veil." (citations omitted; alteration in original)); *see also, e.g., Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 768 (Del. Ch. 2009), *aff'd* 976 A.2d 170 (Del. 2009).

[33] 963 A.2d 746 (Del. Ch. 2009).

[34] *Id.* at 768-69; *see also id.* at 769 ("A huge amount of wealth generation results from the use of distinct entities by corporate parents to conduct business. This allows parents to engage in risky endeavors precisely because the parents can cabin the amount of risk they are undertaking by using distinct entities to carry out certain activities. Delaware law respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise. To follow this traditional practice here works no unfairness to ADS. ADS knew with whom it was contracting and with whom it was not. The bottom line for ADS is that it only contracted with Aladdin . . . . The fact that ADS wishes it had struck a bargain with Blackstone directly does not change the reality that ADS knew that the Merger Agreement did not impose obligations on Blackstone directly.").

19

Recognizing that Peer is not a party to the APA, and that Peer itself therefore has no obligations under the APA, RBC claims that it is seeking to hold SKF to its obligations under the APA. That is precisely the argument rejected by the court in *Alliance Data*.

The majority of the Panel concludes that SKF is not circumventing any obligation it had under the contract. As noted above, SKF did not agree to sell to RBC any Series designations used by Peer. Peer was a stranger to the APA entered into between RBC and SKF before SKF acquired Peer. So, Peer's pre-APA and post-APA activities and the question whether Peer should stop its activities complained of now by RBC was not within the reasonable or "justified expectations of the parties" — an oft-cited element of the implied covenant of good faith and fair dealing.[35]

The APA also does not contain any agreement by SKF that it would not acquire control of any company that was using Series designations, or that it would use best efforts (or any efforts at all) to prevent any company that it ever controlled from using Series designations. RBC could have negotiated for such terms, but it did not. The Panel should not "imply a term not explicitly contemplated by the contract" or otherwise rewrite the parties' contract.[36]

---

[35] See Restatement (Second) Contracts § 205(a).

[36] *See, e.g., John B. Conomos, Inc. v. Sun Co.*, 831 A.2d 696, 706-07 (Pa. Super. Ct. 2003) ("As this obligation of good faith is tied specifically to and is not separate from the [express] duties a contract imposes on the parties, it cannot imply a term not explicitly contemplated by the contract. Both the implied covenant of good faith and the doctrine of necessary implication are principles for courts to harmonize the reasonable expectations of the parties with the intent of the contractors and the terms in their contract." (citation and internal quotations omitted; alteration in original)); *Middletown Carpentry, Inc. v. Arena & Co.*, 2003 Phila. Ct. Com. Pl. LEXIS 57, at *25 (Pa. Ct. Com. Pl. Nov. 18, 2003) (refusing to impose obligation not contemplated by parties' contract).

20

In whatever manner RBC's argument relating to the SKF's unexercised control over Peer is phrased, whether as a matter of equitable fairness or as veil-piercing, RBC needs to show that Peer is SKF's alter ego and vice versa.  This showing has not been made.[37]

To support its contention that Peer is SKF's alter ego, RBC points to the factors described by the court in *Simeone v. Bombardier-Rotax GMBH*.[38]  In *Simeone*, the court conducted an alter ego analysis in order to conclude that Rotax, a wholly-owned subsidiary of Bombardier, was subject to personal jurisdiction in Pennsylvania.  The court identified ten non-exclusive factors that Pennsylvania courts consider when determining whether an alter ego relationship exists.[39]  The court concluded that Rotax was an alter ego of Bombardier, based in part on the facts that Bombardier management, rather than Rotax management, made major business decisions for Rotax; Rotax sold approximately 45% of its product to Bombardier; Rotax could not develop a new product without authorization from Bombardier; and Bombardier held itself and Rotax out to the

---

[37] *See, e.g., Lumax Indus. Inc. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995) ("[T]here is a strong presumption in Pennsylvania against piercing the corporate veil.  Also, the general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person." (citations omitted)); *Jiffy Lube Int'l, Inc. v. Jiffy Lube of Pa., Inc.*, 848 F. Supp. 569, 580-81 (E.D. Pa. 1994) (discussing the requirements for piercing the corporate veil on an alter ego theory under Pennsylvania law).

[38] 360 F. Supp. 2d 665 (E.D. Pa. 2005).

[39] *Id.* at 675.

public as a single entity.[40]  The facts here are different, as demonstrated by the fourteen points summarized above.[41]

Although it is undisputed that SKF has the power to control Peer, there is no evidence that SKF has *exercised* that control in a matter warranting disregard of SKF's and Peer's separate corporate existence.  SKF and Peer have publicly maintained their separate identities, and Peer management decides how to operate the business.  As SKF points out, under Pennsylvania law there must be "a very high showing of domination and control" and "there is a strong presumption ... against piercing ..." that can be overcome only if the separate corporate status is "ignored" where "separate existence was a mere sham."[42]  RBC has not satisfied that high standard, and the *Simeone* analysis is distinguishable.

In support of its contention that veil piercing and a finding of alter ego status is warranted, RBC asserts, among other things, that SKF designees comprise a majority of the Peer board and that SKF personnel comprise a large percentage of Peer's senior management.  SKF disputes RBC's calculation of the prominence of SKF personnel in Peer's business and contends not only that Peer personnel occupy a significant percentage of Peer's management, but also that Peer operates independently of SKF.

As noted above, RBC has significantly overstated the record, asserting, among other things, that the record 'demonstrates the overwhelming control SKF exerts over Peer" and that "SKF executives are heavily involved in controlling Peer's day-to-day

---

[40] *Id.* at 676-78.

[41] See pp. 13-14 supra.

[42] SAB at 28.

operations."[43]  Also, as noted above, Peer's senior officers who carry out the day-to-day

management of Peer's business are not SKF employees; all four of the senior executives

of Peer who manage day-to-day operations, including Peer's chief executive officer, are

Peer employees, not SKF employees and only one of them has ever been, but is not

currently, employed by any SKF-affiliated company.  Other Peer officers, who fulfill

corporate governance-oriented roles such as Secretary and Assistant Secretary, are

employees of SKF.[44]  Although the five-person Peer board of directors includes three

people who are employed by SKF or its affiliates, there is no evidence that the Peer board

of directors has exercised control over Peer's day-to-day management of the business.[45]

     In the view of the majority, however, even if RBC's calculations of Peer's officer

and director ranks are correct, no basis for veil piercing has been established.  By either

RBC's count or SKF's count, such configurations of board and senior management are

often common in parent/subsidiary relationships.  Wholly owned subsidiaries with such

configurations are not necessarily the alter egos or mere instrumentalities of their

parents.[46]  To conclude otherwise would turn longstanding law of separate corporate

existence on its head.[47]

---

[43] *See supra* note 17 and accompanying text.

[44] *See supra* note 18 and accompanying text.

[45] *See supra* text accompanying note 19.

[46] See SAB at p. 11, n. 48 (citing HARRY G. HENN & JOHN R. ALEXANDER, LAWS OF CORPORATIONS AND OTHER BUSINESS ENTERPRISES 355 (1983)); *see also, e.g., Shared Commc'ns Servs. of 1800-80 JFK Boulevard, Inc. v. Bell Atlantic Props. Inc.*, 692 A.2d 570, 573 (Pa. Super. Ct. 1997) ("Although a parent and a wholly owned subsidiary do share common goals, they are still recognized as separate and distinct legal entities."); *Commonwealth v. Vienna Health Products, Inc.*, 726 A.2d 432, 434 (Pa. Commw. Ct.

RBC has not pointed to an obligation of SKF under the APA that is violated by SKF's ownership of a subsidiary that has long been engaging in the conduct at issue.[48] SKF argues that granting the mandatory injunction RBC requests would give RBC more than it bargained for.[49] The majority of the Panel agrees. Such an injunction would allow RBC to eliminate Peer's long standing use of Series terms and its opposition to RBC's trademark quest, without RBC having bargained for those terms when purchasing the Nice business from SKF.

### Indemnification

There is no indemnification owing to RBC under paragraph 2 of the Interim Award because, under § 9.01 of the APA, the amount of indemnification that RBC would be entitled to receive from SKF under paragraph 2 of the Interim Award did not exceed the $100,000 minimum threshold.

### CONCLUSION

NOW, THEREFORE, this 4th day of April, 2012, for the reasons set forth in the first Interim Award and Order and in this Final Award and Order, IT IS ORDERED that:

1.    RBC's request for an injunction against SKF regarding the Peer activities is DENIED;

---

1999) ("The general rule in Pennsylvania is that a corporation is to be treated as a separate and independent entity even if its stock is owned entirely by one person . . . .").

[47] See text and authorities cited *supra* at 17-19.

[48] SKF is not allowing its branding to be used on products sold with series designations by another company.

[49] SAB at 26.

24

2.    RBC's request for indemnification by SKF of its costs occasioned by Peer's actions is DENIED;

3.    SKF's request that the Panel reconsider its Interim Award is DENIED;

4.    RBC's request for indemnification under paragraph 2 of the Interim Award is DENIED;

5.    Paragraphs 1, 3, 4 and 6 of the Interim Award and Order are REAFFIRMED and the remaining paragraphs are moot or are dealt with in this Final Award and Order; and

6.    Each party is to pay its own costs, expenses and attorneys' fees. The administrative filing fees of the AAA, totaling $3,625.00, and the fees and expenses of the arbitrators, totaling $401,636.53, shall be borne as incurred

7.    This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

8.    This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.


FOR THE MAJORITY:


_____
Arlin M. Adams, Chairman



_____
E. Norman Veasey, Arbitrator


25

2.    RBC's request for indemnification by SKF of its costs occasioned by Peer's actions is DENIED;

3.    SKF's request that the Panel reconsider its Interim Award is DENIED;

4.    RBC's request for indemnification under paragraph 2 of the Interim Award is DENIED;

5.    Paragraphs 1, 3, 4 and 6 of the Interim Award and Order are REAFFIRMED and the remaining paragraphs are moot or are dealt with in this Final Award and Order; and

6.    Each party is to pay its own costs, expenses and attorneys' fees. The administrative filing fees of the AAA, totaling $3,625.00, and the fees and expenses of the arbitrators, totaling $401,636.53, shall be borne as incurred

7.    This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

8.    This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.


FOR THE MAJORITY:

_____

Arlin M. Adams, Chairman


E. Norman Veasey, Arbitrator

25

# EXHIBIT J

# AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| IN THE ARBITRATION BETWEEN | : |
| | : |
| RBC NICE BEARINGS, INC., ROLLER | : |
| BEARING COMPANY OF AMERICA, | : |
| INC., and ROLLER BEARING COMPANY | : |
| OF AMERICA, d/b/a NICE BALL | : |
| BEARINGS, INC. | : |
| | : Case No. 14 152 01622 09 |
| Claimants, | : |
| | : |
| and | : |
| | : |
| SKF USA INC., | : |
| | : |
| Respondent. | : |
| | : |

## RESPONDENT SKF USA INC.'S OBJECTIONS AND RESPONSES TO CLAIMANTS' SUPPLEMENTAL DISCOVERY REQUESTS

Respondent SKF USA Inc., by its attorneys, hereby objects and responds to Claimants' Supplemental Discovery Requests. The disclosure of any information, documents, and/or things in connection with the following responses shall not be construed as an admission by SKF USA Inc. that such information, documents, and/or things are admissible at any proceeding or hearing before the Panel in the above-captioned Arbitration. Moreover, SKF USA Inc. preserves all objections as to the relevance and admissibility of any information, documents, and/or things provided in response to Claimants' Supplemental Discovery Requests as evidence for any purpose at any proceeding or hearing before the Panel.

## OBJECTIONS TO INSTRUCTIONS AND DEFINITIONS

1.      SKF USA Inc. objects to Claimants' Instructions and Definitions to the extent that they define "SKF" (Definitions at ¶ 2) as including SKF China Limited, SKF (Thailand) Ltd., and SKF (U.K.) Corporate Holdings Limited (collectively, the "SKF Foreign Entities"), and to the extent the Instructions and Definitions seek to require production of documents and information within the possession, custody, or control of the SKF Foreign Entities. The only entity, besides Claimants, that is subject to the jurisdiction of the Panel and obligated to participate in this Arbitration under Section 11.11 of the Asset Purchase Agreement dated as of February 28, 1997 (the "1997 APA") is SKF USA Inc. Thus, only information and documents within the possession, custody, or control of SKF USA Inc. will be provided in response to Claimants' discovery requests. Further, as Claimants have not asserted claims against the SKF Foreign Entities nor alleged that they committed/caused any alleged breaches of

the 1997 APA, any discovery requests directed to the SKF Foreign Entities are objectionable in that they seek information/documents that are not relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. References to "SKF" in the following discovery responses are references to Respondent SKF USA Inc.

2.   SKF objects to Claimants' Definitions to the extent that they define "Peer" (Definitions at ¶ 3) as including LG Hongkong Holding Limited (also known as Peer HK), Peer Bearing (Thailand) Co. Ltd. (also known as Peer Thailand), Peer Bearing Limited (also known as Peer UK), Illinois Peer Bearing Company, L.L.C. (also known as Peer LLC), and any member of the Spungen family (collectively, the "Peer-Affiliated Persons and Entities"). Claimants have not asserted any claims against SKF regarding alleged actions of any of the Peer-Affiliated Persons and Entities. Claimants' allegations in the Demand for Arbitration and Statement of Claim dated September 14, 2009, are confined to allegations regarding SKF and "Peer Bearing Company," the SKF subsidiary that SKF acquired by the Stock Purchase Agreement (the "SKF/Peer SPA"). Thus, to the extent that Claimants' discovery requests seek information and/or documents relating to the Peer-Affiliated Persons and Entities, Claimants' discovery requests are objectionable in that they seek information/documents that are not relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. References to "Peer" in the following discovery responses are references to Peer Bearing Company.

## SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES

1.   **Identify, by name and title, the members of the Boards of Directors of all of the entities defined above as "SKF" from June 25, 2008 to date.**

**RESPONSE:**   The following persons have served as members of the board of directors of SKF from September 11, 2008,[1] through the present:

**2008 and 2009**

(1) George Detloff, President, SKF USA Inc.
(2) Bo Bergqvist, Vice President, Finance, SKF USA Inc.
(3) Timothy D. Gifford, Esq., Senior Vice President, General Counsel, and Secretary, SKF USA Inc.

**2010 and 2011**

---

[1] Although SKF and Peer signed the SKF/Peer SPA on June 25, 2008, SKF and Peer did not close the transaction until September 11, 2008. Thus, since the Panel has agreed to receive additional evidence regarding the extent of SKF's alleged control over Peer following the acquisition (*see* Interim Award and Order dated March 25, 2011, at 2-3, 12-13), SKF will provide information and produce documents responsive to RBC's discovery requests that relate to the business affairs of SKF and/or Peer from September 11, 2008, through the present.

#14519586 v5

(1) Poul Jeppesen, President and Chief Executive Officer, SKF
USA Inc.
(2) Gunilla Nilsson, Vice President, Finance, SKF USA Inc.
(3) Timothy D. Gifford, Esq., Senior Vice President, General
Counsel, and Secretary, SKF USA Inc.

    **2.   Identify, by name and title, the members of the Boards of Directors of all
of the entities defined above as "Peer" from June 25, 2008 to date.**

    **RESPONSE:**    The following persons have served as members of the board of
directors of Peer from September 11, 2008, through the present:

<u>**2008 and 2009**</u>

(1) Patrick Tong, President and Treasurer, Peer Bearing Company
(2) Phil Knights, Chairman of the Board of Peer Bearing Company
(3) George W. Dettloff, President, SKF USA Inc. (resigned
3/15/2010)
(4) Bo Bergqvist, Vice President, Finance, SKF USA Inc.
(resigned 3/15/2010)
(5) Lawrence Spungen

<u>**2010**</u>

(1) Patrick Tong, President and Treasurer, Peer Bearing Company
(2) Phil Knights, Chairman of the Board of Peer Bearing Company
(resigned 6/2/2010)
(3) Poul Jeppesen, President and Chief Executive Officer, SKF
USA Inc.
(4) Gunilla Nilsson, Vice President, Finance, SKF USA Inc.
(5) Laurence Spungen

<u>**2011**</u>

(1) Patrick Tong, President and Treasurer, Peer Bearing Company
(2) Poul Jeppesen, President and Chief Executive Officer, SKF
USA Inc.
(3) Gunilla Nilsson, Vice President, Finance, SKF USA Inc.
(4) Tore Bertilsson, Executive Vice President, AB SKF
(5) Laurence Spungen

    **3.   State whether any member of the Board of Directors of any of the entities
defined above as "Peer" has ever been a board member of any of the entities defined above
as "SKF."**

    **OBJECTION:**    SKF objects to this Interrogatory since it is not confined to the
relevant time period and thus seeks information that is neither relevant to the parties'
claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.  The

-3-

Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any member of Peer's board of directors served on SKF's board of directors prior to SKF's acquisition of Peer is irrelevant.

**RESPONSE:**     Subject to and without waiver of the Objection set forth above, SKF responds as follows: The following members of Peer's board of directors have served and are currently serving as members of SKF's board of directors: (1) Poul Jeppesen, President and Chief Executive Officer, SKF USA Inc.; and (2) Gunilla Nilsson, Vice President, Finance, SKF USA Inc.

**4.  If your answer to preceding interrogatory is in the affirmative, identify the board member(s) by name, title(s), and date(s) of board membership.**

**RESPONSE:**     SKF incorporates by reference, as if fully set forth herein, its objections and responses to Interrogatories 1, 2, and 3.

**5.  State whether any member of the Board of Directors of any of the entities defined above as "SKF" has ever been a board member of any of the entities defined above as "Peer."**

**OBJECTION:**     SKF objects to this Interrogatory since it is not confined to the relevant time period and thus seeks information that is neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. The Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any member of SKF's board of directors served on Peer's board of directors prior to SKF's acquisition of Peer is irrelevant.

**RESPONSE:**     Subject to and without waiver of the Objection set forth above, SKF responds as follows: The following members of SKF's board of directors have served and are currently serving as members of Peer's board of directors: (1) Poul Jeppesen, President and Chief Executive Officer, SKF USA Inc.; and (2) Gunilla Nilsson, Vice President, Finance, SKF USA Inc.

**6.  If your answer to the preceding interrogatory is in the affirmative, identify the board member(s) by name, title(s), and date(s) of board membership.**

**RESPONSE:**     SKF incorporates by reference, as if fully set forth herein, its objections and responses to Interrogatories 1 through 5.

**7.  State whether any member of the Board of Directors of any of the entities defined above as "Peer" receives or has ever received instruction or direction concerning Peer's business operations, including the marketing and sale of Peer Bearings, from any member of the Board of Directors of any of the entities defined above as "SKF."**

-4-

**OBJECTION:**    SKF objects to this Interrogatory as overly broad and unduly burdensome to the extent that it seeks information regarding the undefined and vague term "business operations." SKF further objects to this Interrogatory since it is not confined to the relevant time period and thus seeks information that is neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. The Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any member of SKF's board of directors provided instruction or direction concerning Peer's business operations to a member of Peer's board of directors prior to September 11, 2008, is irrelevant.

**RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: From September 11, 2008 through the present, members of SKF's board of directors, in their roles as members of Peer's board of directors, have provided general advice to the Peer board regarding preservation and expansion of Peer's market share, but have not provided any specific instructions or directions concerning the marketing and sale of Peer bearing products. As Peer's board of directors is not responsible for managing Peer's day-to-day business operations, the members of SKF's board of directors who serve on Peer's board of directors do not provide instruction or direction regarding issues relating to the marketing and sale of Peer bearing products to other members of Peer's board.

8.  If your answer to the preceding interrogatory is in the affirmative, **identify the individuals by name(s), title(s), date(s), and (d) nature of instruction or direction.**

**RESPONSE:**    Not applicable.

9.  **State whether any officer or manager of any of the entities defined above as "Peer" receives or has ever received instruction or direction concerning Peer's business operations, including the marketing and sale of Peer Bearings, from any member of the Board of Directors of any of the entities defined above as "SKF."**

**OBJECTION:**    SKF objects to this Interrogatory as overly broad and unduly burdensome to the extent that it seeks information regarding the undefined and vague term "business operations." SKF further objects to this Interrogatory since it is not confined to the relevant time period and thus seeks information that is neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. The Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any member of SKF's board of directors provided instruction or direction concerning Peer's business operations to an officer or manager of Peer prior to September 11, 2008, is irrelevant.

**RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: From September 11, 2008 through the present, members of SKF's board of directors, in their roles as members of Peer's board of directors, have provided general

-5-

advice to officers of Peer at Peer board meetings regarding preservation and expansion of Peer's market share, but have not provided specific instructions or directions concerning the marketing and sale of Peer bearing products to any officer or manager of Peer. Further, AB SKF, the parent company of SKF and the ultimate parent company of Peer, has instructed SKF and Peer that they are to function as competitors in the bearing market with regards to the marketing and sale of bearing products. As such, neither members of SKF's board of directors nor any other SKF employees have had any involvement with Peer's marketing and sales efforts since the acquisition.

     **10. If your answer to the preceding interrogatory is in the affirmative, identify the individuals by name(s), title(s), date(s), and (d) nature of instruction or direction.**

        **RESPONSE:**    Not applicable.

     **11. State whether any officer or manager of any of the entities defined above as "Peer" receives or has ever received instruction or direction concerning Peer's business operations, including the marketing and sale of Peer Bearings, from any officer or manager of any of the entities defined above as "SKF."**

        **OBJECTION:**    SKF objects to this Interrogatory as overly broad and unduly burdensome to the extent that it seeks information regarding the undefined and vague term "business operations." SKF further objects to this Interrogatory since it is not confined to the relevant time period and thus seeks information that is neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. The Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any officer or manager of SKF provided instruction or direction concerning Peer's business operations to an officer or manager of Peer prior to September 11, 2008, is irrelevant.

        **RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: From September 11, 2008 through the present, officers of SKF, in their roles as members of Peer's board of directors, have provided general advice to officers of Peer at Peer board meetings regarding preservation and expansion of Peer's market share, but have not provided specific instructions or directions concerning the marketing and sale of Peer bearing products to any officer or manager of Peer. SKF incorporates by reference, as if fully set forth herein, SKF's Response to Interrogatory 9.

     **12. If your answer to the preceding interrogatory is in the affirmative, identify the individuals by name(s), title(s), date(s), and (d) nature of instruction or direction.**

        **RESPONSE:**    Not applicable.

     **13. State whether any member of the Board of Directors of any of the entities defined above as "SKF" has attended or attends (in person, by phone, written consent,**

videoconference and/or by teleconferencing) any meeting of the Board of Directors of any of the entities defined above as "Peer."

**OBJECTION:**   SKF objects to this Interrogatory since it is not confined to the relevant time period and thus seeks information that is neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. The Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any member of SKF's board of directors attended a meeting of the board of directors of Peer prior to September 11, 2008, is irrelevant.

**RESPONSE:**   Subject to and without waiver of the Objection set forth above, SKF responds as follows: From September 11, 2008 through the present, members of SKF's board of directors have attended meetings of Peer's board of directors.

**14. If your answer to the preceding interrogatory is in the affirmative, identify the board member(s) by name, title(s), and date(s) of attendance.**

**RESPONSE:**

George Detloff
President, SKF USA Inc.
Participated in meetings of Peer's board of directors on September 11, 2008, September 24, 2008, November 14, 2008, December 5 2008, May 19, 2009, August 25, 2009, December 3, 2009, and March 16, 2010

Bo Bergqvist
Vice President, Finance, SKF USA Inc.
Participated in meetings of Peer's board of directors on September 11, 2008, September 24, 2008, November 14, 2008, December 5 2008, May 19, 2009, August 25, 2009, December 3, 2009, and March 16, 2010

Timothy D. Gifford, Esq.
Senior Vice President, General Counsel, and Secretary, SKF
Participated in meetings of Peer's board of directors on September 11, 2008, November 14, 2008, March 15, 2010, and June 3, 2010

Poul Jeppesen
President and Chief Executive Officer, SKF USA Inc.
Participated in meetings of Peer's board of directors on March 15, 2010, March 16, 2010, June 3, 2010, and October 15, 2010

Gunilla Nilsson
Vice President, Finance, SKF USA Inc.

#14519586 v5

Participated in meetings of Peer's board of directors on March 15,
2010, March 16, 2010, June 3, 2010, and October 15, 2010

**15. Identify, by name and title, all of the officers and managers of all of the
entities defined above as "SKF" from June 25, 2008 to date.**

**OBJECTION:**     SKF objects to this Interrogatory since it is overly broad and
seeks information that is neither relevant to the parties' claims/defenses nor reasonably
calculated to lead to the discovery of admissible evidence.  SKF has hundreds of employees who
serve in official, executive, and managerial roles, and only a small percentage of them possess
any information regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2)
the post-acquisition corporate relationship between SKF and Peer.  Thus, SKF objects to
disclosing the identity of "all of the officers and managers of [SKF] from June 25, 2008 to date."

**RESPONSE:**     Subject to and without waiver of the Objection set forth above,
SKF responds as follows:  The following SKF officers and managers were the principal SKF
employees involved with SKF's acquisition of Peer:

> (1) Timothy D. Gifford, Esq., Senior Vice President, General
> Counsel, and Secretary;

> (2) Jane Webber, Esq., Associate General Counsel and Assistant
> Secretary; and

> (3) Timothy Richards, Vice President, Business Development.

The following SKF officers and managers are most knowledgeable about the post-acquisition
corporate relationship between SKF and Peer:

> (1) Poul Jeppesen, President and Chief Executive Officer;

> (2) Gunilla Nilsson, Vice President, Finance;

> (3) Timothy D. Gifford, Esq., Senior Vice President, General
> Counsel, and Secretary; and

> (4) Jane K. Webber, Esq., Associate General Counsel and
> Assistant Secretary.

**16. Identify, by name and title, all of the officers and managers of all of the
entities defined above as "Peer" from June 25, 2008 to date.**

**OBJECTION:**     SKF objects to this Interrogatory since it is overly broad and
seeks information that is neither relevant to the parties' claims/defenses nor reasonably
calculated to lead to the discovery of admissible evidence.

**RESPONSE:**     Subject to and without waiver of the Objection set forth above,
SKF responds as follows:  The following people are currently serving as officers of Peer:

-8-

(1) Patrick Tong, President and Treasurer

(2) Poul Jeppesen, Chairman of the Board

(3) Glenn Spungen, Vice President

(4) Bob St. Clair, Chief Financial Officer

(5) Jeffrey J. DeLisi, Assistant Treasurer

(6) Brian J. Duffy, Assistant Treasurer

(7) Timothy D. Gifford, Esq., Secretary

(8) Jane K. Webber, Esq., Assistant Secretary

(9) Richard W. Frett, Esq., Assistant Secretary

**17. State whether any officers or managers of any of the entities defined above as "SKF" have ever been board members of any of the entities defined above as "Peer."**

**OBJECTION:**     SKF objects to this Interrogatory since it is not confined to the relevant time period and thus seeks information that is neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. The Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any officer or manager of SKF was a member of Peer's board of directors prior to September 11, 2008, is irrelevant.

**RESPONSE:**     Subject to and without waiver of the Objection set forth above, SKF responds as follows:  From September 11, 2008 through the present, officers of SKF have served on Peer's board of directors.

**18. If your answer to the preceding interrogatory is in the affirmative, identify the SKF officers and managers by name, title(s), and date(s) of being Peer board members.**

**RESPONSE:**     SKF incorporates by reference, as if fully set forth herein, its Response to Interrogatory 2.

**19. State whether any officers or managers of any of the entities defined above as "Peer" have ever been officers or managers of any of the entities defined above as "SKF."**

**OBJECTION:**     SKF objects to this Interrogatory since it is not confined to the relevant time period and thus seeks information that is neither relevant to the parties'

-9-

claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. The Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any officer or manager of Peer was also an officer or manager of SKF prior to September 11, 2008, is irrelevant.

      **RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: From September 11, 2008 through the present, officers of Peer have served as officers of SKF.

      **20. If your answer to the preceding interrogatory is in the affirmative, identify the "Peer" officers and managers by name, title(s), and date(s) of being "SKF" officers or managers.**

      **RESPONSE:**

      (1) Poul Jeppesen, Chairman of the Board of Peer beginning in 2011, has served as SKF's President and Chief Executive Officer since 2010.

      (2) Jeffrey J. DeLisi, Assistant Treasurer of Peer since 2008, has served as Assistant Treasurer of SKF during that same time period.

      (3) Brian J. Duffy, Assistant Treasurer of Peer since 2008, has served as Treasurer of SKF during that same time period.

      (4) Timothy D. Gifford, Esq., Secretary of Peer since 2008, has served as Senior Vice President, General Counsel, and Secretary of SKF during that same time period.

      (5) Jane K. Webber, Esq., Assistant Secretary of Peer since 2008, has served as Assistant Secretary of SKF during that same time period.

      (6) Richard W. Frett, Esq., Assistant Secretary of Peer since 2008, has served as Assistant Secretary of SKF during that same time period.

      **21. State whether any officer or manager of any of the entities defined above as "SKF" attends or has attended (in person, by phone, written consent, videoconference and/or by teleconferencing) a meeting of the Board of Directors of any of the entities defined above as "Peer."**

      **OBJECTION:**    SKF objects to this Interrogatory since it is not confined to the relevant time period and thus seeks information that is neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. The Panel has agreed to receive additional evidence regarding (1) SKF's acquisition of Peer on or

about September 11, 2008, and (2) the extent of SKF's alleged control over Peer following that acquisition. *See* Interim Award and Order dated March 25, 2011, at 2-3, 12-13. Thus, whether any officer or manager of SKF attended a meeting of the board of directors of Peer prior to September 11, 2008, is irrelevant.

**RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: From September 11, 2008 through the present, officers of SKF have attended meetings of the board of directors of Peer.

**22. If your answer to the preceding interrogatory is in the affirmative, identify the "SKF" officers or member(s) by name, title(s), and date(s) of attendance.**

**RESPONSE:**    SKF incorporates by reference, as if fully set forth herein, its Response to Interrogatory 14. SKF further responds as follows:

> Jane K. Webber, Esq.
> Associate General Counsel and Assistant Secretary, SKF USA Inc.
> Participated in meetings of Peer's board of directors on September 24, 2008, November 14, 2008, May 19, 2009, December 3, 2009, March 16, 2010, and June 3, 2010

**23. List the names of the stockholders of any of the entities defined above as "Peer" since the Peer Acquisition Date of June 25, 2008, together with an indication of the number of shares and class of stock owned by each stockholder.**

**RESPONSE:**    Since September 11, 2008, SKF has owned 240 shares of Class B common stock of Peer, which constitutes 100 percent of the stock issued by Peer.

**24. Since the Peer Acquisition Date of June 25, 2008, state whether the entities defined above as "Peer" maintains their own separate corporate records and systems, that is, corporate records and systems independent of "SKF's" corporate records.**

**OBJECTION:**    SKF objects to this Interrogatory as overly broad and unduly burdensome to the extent that it seeks information regarding the undefined and vague term "corporate records and systems."

**RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: From September 11, 2008 through the present, Jane K. Webber, Esq. has, in her role as Assistant Secretary of Peer, maintained the following documents relating to Peer's corporate governance at SKF's corporate headquarters which is located at 890 Forty Foot Road, Lansdale, PA 19443-0332: (1) Peer's Articles of Incorporation and By-Laws; (2) the minute book for meetings of Peer's board of directors; and (3) Peer's share register. These documents are kept separate from SKF's corporate documents. All other corporate records relating to Peer, including Peer's books and records of accounts, are maintained by Peer at its corporate headquarters which is located at 2200 Norman Dr., Waukegan, IL 60085.

**25. If your answer to the preceding interrogatory is in the affirmative, identify the location(s) and types of corporate records.**

-11-

**RESPONSE:**      See Response to Interrogatory 24.

**26. State whether any of the entities defined above as "SKF" have access to the corporate records and systems of any of the entities defined above as "Peer," and, if so, identify the reason(s) for said access.**

**OBJECTION:**   SKF objects to this Interrogatory as overly broad and unduly burdensome to the extent that it seeks information regarding the undefined and vague term "corporate records and systems."

**RESPONSE:**      Subject to and without waiver of the Objection set forth above, SKF responds as follows: SKF has access to the following documents relating to Peer's corporate governance as they are maintained by Jane K. Webber, Esq., SKF's Associate General Counsel and Assistant Secretary and Peer's Assistant Secretary, at SKF's corporate headquarters which is located at 890 Forty Foot Road, Lansdale, PA 19443-0332: (1) Peer's Articles of Incorporation and By-Laws; (2) the minute book for meetings of Peer's board of directors; and (3) Peer's share register. Further, SKF, as a shareholder of Peer, has a statutory right to examine corporate records that Peer maintains at its corporate headquarters in Waukegan, Illinois. *See, e.g.,* 15 Pa. C.S. § 1508(b) (entitled "RIGHT OF INSPECTION BY A SHAREHOLDER"); 805 Ill. Comp. Stat. 5/7.75 (b) (entitled "Corporate Records – Examination by shareholders"). Since acquiring Peer on or about September 11, 2008, SKF has not exercised its statutory right of inspection.

**27. List all employees of any of the entities defined above as "SKF" who have management responsibilities at any of the entities defined above as "Peer," including all SKF employees who have management, approval and supervision responsibilities with respect to strategy and operations.**

**RESPONSE:**      From September 11, 2008 through the present, no SKF employees have had responsibilities relating to the management of Peer's business operations. The SKF officers who serve as officers of Peer are only responsible for managing matters relating to Peer's corporate governance. SKF incorporates by reference, as if fully set forth herein, SKF's Response to Interrogatory 9.

**28. List all individuals at any of the entities defined above as "SKF" who, at the management level, control or take part in decisions concerning the sale, marketing, design and engineering of Peer Bearings.**

**OBJECTION:**   SKF objects to this Interrogatory as unduly burdensome and duplicative in that seeks information previously sought by Interrogatory 27. The repetitive nature of Claimants' Interrogatories is abusive.

**RESPONSE:**      Subject to and without waiver of the Objection set forth above, SKF responds as follows: No management-level SKF employees control or take part in decisions concerning the sale, marketing, design, and engineering of Peer bearing products. SKF incorporates by reference, as if fully set forth herein, SKF's Response to Interrogatory 9.

-12-

#14519586.v5

29. Describe the extent of integration and overlap between SKF sales employees and Peer sales employees concerning the marketing and sale of Peer Bearings.

**RESPONSE:** None. SKF's sales personnel have not sold and do not sell Peer bearing products.

30. Identify the extent of involvement of any entity defined above as "SKF" in sale of Peer Bearings.

**OBJECTION:** SKF objects to this Interrogatory as unduly burdensome and duplicative in that seeks information previously sought by Interrogatories 28 and 29. The repetitive nature of Claimants' Interrogatories is abusive.

**RESPONSE:** Subject to and without waiver of the Objection set forth above, SKF responds as follows: Not at all. SKF incorporates by reference, as if fully set forth herein, its Response to Interrogatory 29.

31. Identify any individuals at any of the entities defined above as "SKF" who participate or have participated in litigation decisions concerning (a) *Peer Bearing Company v. RBC Bearings Inc.,* Opp. No. 91171191 (T.T.A.B. filed May 31, 2006), and (b) *RBC Nice Bearings, Inc. v. Peer Bearing Company,* No. 3:06-CV-1380-VLB (D. Conn.).

**RESPONSE:** Timothy D. Gifford, Esq., Senior Vice President, General Counsel, and Secretary of SKF.

32. Identify the extent to which any of the entities defined above as "SKF" has provided Peer with financial support since June 25, 2008 (apart from the purchase price related to the Peer Acquisition Agreement).

**RESPONSE:** SKF has not provided Peer with financial support following the acquisition.

33. Identify the extent of involvement by any of the entities defined above as "SKF" in (a) *Peer Bearing Company v. RBC Bearings Inc.,* Opp. No. 91171191 (T.T.A.B. filed May 31, 2006) and (b) *RBC Nice Bearings, Inc. v. Peer Bearing Company,* No. 3:06-CV-1380-VLB (D. Conn.).

**RESPONSE:** Peer's outside counsel communicated with Timothy D. Gifford, Esq. on legal strategy in the USPTO and district court proceedings in which SKF and Peer had a common legal interest in defeating RBC's efforts to obtain trademark rights in the Series terms.

In addition, at Peer's request, SKF asked its former general counsel, Allen G. Belenson, Esq., to cooperate with Peer in the preparation of the Declaration of Allen G. Belenson, Esq. that was appended to Peer's Motion for Summary Judgment in *RBC Nice Bearings, Inc. v. Peer Bearing Company,* No. 3:06-CV-1380-VLB (D. Conn.).

#14519586 v5

34. Identify the extent to which any of the entities defined above as "SKF" has (a) participated, (b) coordinated, (c) given advice, and/or (d) communicated with any of the entities defined above as "Peer" concerning the following oppositions to RBC's applications to federally register various SERIES designations as trademarks:

a. *NTN Bearing Corporation of America v. RBC Bearings Inc.*, Opp. No. 91175823 (T.T.A.B. filed Feb. 22, 2007)

b. *Schaeffler KG v. RBC Bearings Inc.*, Opp. No. 91176854 (T.T.A.B. filed Apr. 18, 2007)

c. *Schaeffler KG v. RBC Bearings Inc.*, Opp. No. 91176960 (T.T.A.B. filed Apr. 25, 2007)

d. *Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 91176959 (T.T.A.B. filed Apr. 17, 2007)

e. *Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 91176922 (T.T.A.B. filed Apr. 20, 2007)

f. *Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 91176924 (T.T.A.B. filed Apr. 20, 2007)

g. *Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 91176990 (T.T.A.B. filed Apr. 20, 2007)

h. *Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 91176991 (T.T.A.B. filed Apr. 20, 2007)

i. *Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 91177006 (T.T.A.B. filed Apr. 20, 2007)

j. *Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 91177008 (T.T.A.B. filed Apr. 20, 2007)

k. *Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 91177854 (T.T.A.B. filed Apr. 20, 2007)

l. *Schaeffler KG, Kaydon Corporation, SKF USA Inc., The Timken Company, Koyo Corporation, NTN Bearing Corporation of America, and Peer Bearing Company v. RBC Bearings Inc.*, Opp. No. 78745159 (T.T.A.B. filed Jan. 16, 2007)

m. *Schaeffler KG, Kaydon Corporation, SKF USA Inc., Peer Bearing Company, The Timken Company, and Koyo Corporation v. RBC Bearings Inc.*, Opp. No. 78745178 (T.T.A.B. filed Jan. 16, 2007)

-14-

n.    *Peer Bearing Company, Schaeffler KG, SKF USA Inc., The Timken Company, Koyo Corporation, and Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 78745182 (T.T.A.B. filed Jan. 16, 2007)

o.    *Kaydon Corporation, Schaeffler KG, SKF USA Inc., The Timken Company, Koyo Corporation, and Peer Bearing Company v. RBC Bearings Inc.*, Opp. No. 78754811 (T.T.A.B. filed Jan. 16, 2007)

p.    *Kaydon Corporation, Koyo Corporation of U.S.A., Schaeffler Group USA, Inc., SKF USA Inc., INA-Schaeffler KG, and Peer Bearing Company v. RBC Bearings Inc.*, Opp. No. 78754833 (T.T.A.B. filed Jan. 16, 2007)

q.    *Peer Bearing Company, Koyo Corporation of U.S.A., Kaydon Corporation, Schaeffler Group USA, Inc., INA-Schaeffler KG, and SKF USA Inc. v. RBC Bearings Inc.*, Opp. No. 78754876 (T.T.A.B. filed Jan. 16, 2007)

r.    *Koyo Corporation of U.S.A., Schaeffler Group USA, Inc., SKF USA Inc., INA-Schaeffler KG, Peer Bearing Company, and Kaydon Corporation v. RBC Bearings Inc.*, Opp. No. 78754894 (T.T.A.B. filed Jan. 16, 2007)

s.    *Koyo Corporation of U.S.A., Schaeffler Group USA, Inc., Kaydon Corporation, SKF USA Inc., INA-Schaeffler KG, and Peer Bearing Company v. RBC Bearings Inc.*, Opp. No. 78754907 (T.T.A.B. filed Jan. 16, 2007)

**RESPONSE:**    Not at all.

35. Identify the extent to which any of the entities defined above as "SKF," acting through Peer, has participated in and/or coordinated the oppositions listed in subparts (a) through (s) of the immediately preceding interrogatory.

**RESPONSE:**    Not at all.

36. State whether any of the entities defined above as "SKF" have encouraged any of the entities defined above as "Peer" and other third parties to oppose RBC's trademark applications concerning any of the SERIES product designations.

**OBJECTION:**    SKF objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the common-interest or community-of-interest privilege, and/or the work-product doctrine. SKF further objects to this Interrogatory as vague, ambiguous, and confusing.

**RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: SKF did not encourage Peer or any other entities to file opposition

-15-

proceedings relating to RBC's applications to register the Series designations as trademarks with the United States Patent and Trademark Office.

**37. State whether any of the entities defined above as "SKF" have had any communications with any third parties (that is, a party other than "Peer") to oppose RBC's trademark applications concerning any of the SERIES product designations.**

**OBJECTION:**   SKF objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the common-interest or community-of-interest privilege, and/or the work-product doctrine.

**RESPONSE:**   Subject to and without waiver of the Objection set forth above, SKF responds as follows:  Outside counsel for SKF has had communications and/or been copied on communications with counsel for bearing manufacturers NTN and Koyo regarding oppositions to RBC's applications to have Series designations registered as trademarks with the United States Patent and Trademark Office.  The communications include (1) the documents moved into evidence at the hearing as RBC Trial Exhibit 12-A, and (2) documents 201, 203, 251, 267, and 305 from the privilege log that SKF served on Claimants in September 2010. Documents 201, 203, 251, 267, and 305 from SKF's privilege log are either irrelevant or protected from disclosure under the community-of-interest privilege.  *See generally* N.T. (11/23/2010) at 234.

**38. Identify whether Peer has discontinued selling any products falling within any the SERIES product designations since June 25, 2008 and, if so, identify the individual, by name and title, responsible for the decision to discontinue.**

**OBJECTION:**   SKF objects to this Interrogatory as calling for the disclosure of information that is not within SKF's possession, custody, or control.

**RESPONSE:**   Subject to and without waiver of the Objection set forth above, SKF responds as follows:  Peer is the most reliable source of the information sought by this Interrogatory.  Nevertheless, SKF believes that Peer has not discontinued selling any lines of ball bearings since September 11, 2008.

**39. List any and all departments and/or functions that any of the entities defined above as "SKF" share with any of the entities defined above as "Peer," including whether they share human resources, accounting, purchasing, finance, sales and marketing, information systems/technology, environmental, and tax departments.**

**RESPONSE:**   Following SKF's acquisition of Peer, SKF has been responsible for providing legal and other professional services to Peer relating to Peer's corporate governance, including preparation and maintenance of select corporate records and organization of Peer's board meetings.  Thus, a number of SKF's officers serve as officers of Peer in order to ensure that Peer meets its corporate governance obligations under Peer's By-Laws.  *See, e.g.,* SKF's Responses to Interrogatories 14, 16, 22, and 26.  SKF and Peer, however, have not integrated any departments or functions following the SKF/Peer SPA.

#14519586 v5

**40. Describe the extent of Timothy Gifford's involvement in negotiating the Peer Acquisition Agreement.**

<u>OBJECTION:</u>    SKF objects to this Interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege, the common-interest or community-of-interest privilege, and/or the work-product doctrine.

<u>RESPONSE:</u>    Subject to and without waiver of the Objection set forth above, SKF responds as follows: Timothy D. Gifford, Esq. served as SKF's chief legal counsel during SKF's acquisition of Peer and execution of the SKF/Peer SPA.  Mr. Gifford was responsible for providing legal advice to SKF regarding all aspects of SKF's acquisition of Peer and coordinating the efforts of SKF's outside attorneys who were responsible for preparing and finalizing the SKF/Peer SPA.

**41. Describe the extent of Timothy Gifford's involvement in the management, business operations, marketing, design, manufacturing and sale of Peer Bearings since June 25, 2008.**

<u>RESPONSE:</u>    None.

**42. Identify the persons at (a) SKF and (b) Peer most knowledgeable about the business operations, design, manufacturing, marketing and sale of Peer Bearings.**

<u>RESPONSE:</u>    SKF cannot identify the Peer employee who is most knowledgeable about the business operations, design, manufacturing, marketing, and sale of Peer bearing products.  There is no SKF employee who is knowledgeable about the business operations, design, manufacturing, marketing, and sale of Peer bearing products.

## SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

**1.    Provide all documents relating to the appointment, selection or termination of board members identified in response to Interrogatories 1-6.**

<u>OBJECTION:</u>    SKF objects to this Request to the extent that it seeks irrelevant information regarding appointment, selection, or termination of members of SKF's board of directors.

<u>RESPONSE:</u>    Subject to and without waiver of the Objection set forth above, SKF responds as follows: Subject to the parties agreeing to an amendment to the Stipulated Confidentiality Order that provides for suitable limitations on the dissemination of highly confidential business information, SKF will produce responsive, non-privileged documents within its possession, custody, or control relating to the appointment, selection, or termination of members of Peer's board of directors since September 11, 2008.

**2.  Provide all minutes of any board meetings of any of the entities defined above as "SKF" and "Peer" since June 25, 2008.**

-17-

**OBJECTION:** SKF objects to this Request as overly broad and unduly burdensome to the extent that it seeks production of "all minutes of any board meetings of" SKF and Peer since June 25, 2008. SKF further objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:** Subject to and without waiver of the Objection set forth above, SKF responds as follows: Subject to the parties agreeing to an amendment to the Stipulated Confidentiality Order that provides for suitable limitations on the dissemination of highly confidential business information, SKF will produce the following responsive, non-privileged documents to the extent that they are within SKF's possession, custody, or control: (1) minutes of the meetings of Peer's board of directors from September 11, 2008 through the present, and (2) minutes of the proceedings of SKF's board of directors that concern Peer.

3. **Provide all documents relating to the appointment, hiring or termination of the officers and managers identified in response to Interrogatories 16-21.**

**OBJECTION:** SKF objects to this Request to the extent that it seeks irrelevant information regarding appointment, selection, or termination of SKF's officers and managers.

**RESPONSE:** Subject to and without waiver of the Objection set forth above, SKF responds as follows: Subject to the parties agreeing to an amendment to the Stipulated Confidentiality Order that provides for suitable limitations on the dissemination of highly confidential business information, SKF will produce responsive, non-privileged documents within its possession, custody, or control relating to the appointment, selection, or termination of the following Peer officers from September 11, 2008 through the present: Poul Jeppesen, Phil Knights, Patrick Tong, Glen Spungen, Bob St. Clair, Timothy D. Gifford, Esq., Jane K. Webber, Esq., Richard W. Frett, Esq., Jeffrey J. DeLisi, and Brian J. Duffy.

4. **For any of the entities defined above as "SKF" and "Peer," provide all (a) minutes of shareholder meetings, (b) shareholder consents entered into and (c) any related correspondence sent or received since the Peer Acquisition Date of June 25, 2008.**

**OBJECTION:** SKF objects to this Request to the extent that it requests production of documents that are not within SKF's possession, custody, or control. In addition, SKF objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:** Subject to and without waiver of the Objection set forth above, SKF responds as follows: SKF will produce the following responsive, non-privileged documents to the extent they are within SKF's possession, custody, or control: (1) minutes from Peer shareholder meetings held from September 11, 2008 through the present, and (2) consents entered into by Peer's shareholder since September 11, 2008.

5. **Provide all policies and procedures of any of the entities defined above as "SKF" and "Peer" in effect as of and subsequent to the Peer Acquisition Date of June 25, 2008 that apply to the marketing and sale of Peer Bearings.**

-18-

#14519586 v5

**OBJECTION:**   SKF objects to this Request to the extent that it requests production of documents that are not within SKF's possession, custody, or control.  SKF further objects to this Request as vague, ambiguous, and confusing.  In addition, SKF objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**   Subject to and without waiver of the Objection set forth above, SKF responds as follows:  No responsive documents are within SKF's possession, custody, or control.

6.   **Provide all documents concerning SKF and Peer policies, and procedures established after the Peer Acquisition Date concerning human resources, accounting, purchasing, finance, sales and marketing, information systems/technology, environmental, and tax.**

**OBJECTION:**   SKF objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**   Subject to and without waiver of the Objection set forth above, SKF responds as follows:  No responsive documents are within SKF's possession, custody, or control.

7.   **Provide all documents concerning business agreements between any of the entities defined above as "SKF" and "Peer," including documents reflecting communications regarding the marketing and sale of Peer Bearings.**

**OBJECTION:**   SKF objects to this Request since it is not confined to the relevant time period and thus seeks documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**   Subject to and without waiver of the Objection set forth above, SKF responds as follows:  Aside from the SKF/Peer SPA, no responsive documents are within SKF's possession, custody, or control.

8.   **Provide all documents generated or prepared by any of the entities defined above as "SKF" and "Peer" concerning the marketing and sale of Peer Bearings.**

**OBJECTION:**   SKF objects to this Request to the extent that it requests production of documents that are not within SKF's possession, custody, or control.  SKF further objects to this Request as unduly burdensome and duplicative in that seeks information previously sought by Request No. 5.  The repetitive nature of Claimants' Requests is abusive.  In addition, SKF objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**     Subject to and without waiver of the Objection set forth above, SKF responds as follows:  No responsive documents are within SKF's possession, custody, or control.

9.  **Provide all documents concerning the participation by any of the entities defined above as "SKF" in the marketing and sale of Peer Bearings.**

**RESPONSE:**     No responsive documents are within SKF's possession, custody, or control.

10. **Provide all documents concerning any guaranty entered into by any of the entities defined above as "SKF" of any obligations of any of the entities defined above as "Peer."**

**RESPONSE:**     No responsive documents are within SKF's possession, custody, or control.

11. **Provide all tax returns filed by any of the entities defined above as "Peer" since June 25, 2008, whether separate, consolidated or unitary in any fashion with any of the entities described above as "SKF."**

**RESPONSE:**     Subject to the parties agreeing to an amendment to the Stipulated Confidentiality Order that provides for suitable limitations on the dissemination of highly confidential business information, SKF will produce responsive tax returns from September 11, 2008 through the present.

12. **Provide all documents concerning any transaction between any of the entities defined above as "SKF" and "Peer" since June 25, 2008, including accounting records.**

**OBJECTION:**     SKF objects to this Request as vague, ambiguous, and confusing.  SKF further objects to this Request as overly broad and unduly burdensome to the extent that it seeks documents relating to "any transaction" and information previously sought by Requests 7 and 10.  The repetitive nature of Claimants' Requests is abusive.

**RESPONSE:**     Subject to and without waiver of the Objection set forth above, SKF responds as follows:  No responsive documents are within SKF's possession, custody, or control.

13. **Provide all existing financial statements, including monthly, quarterly, or annual, of any of the entities defined above as "Peer" from June 25, 2008 to date.**

**OBJECTION:**     SKF objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.  SKF further objects to this Request as overly broad and unduly burdensome to the extent that it seeks documents relating to the undefined and vague term "financial statements."

-20-

**RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: Subject to the parties agreeing to an amendment to the Stipulated Confidentiality Order that provides for suitable limitations on the dissemination of highly confidential business information, and if RBC clarifies and narrows this Request to SKF's satisfaction, SKF will produce responsive, non-privileged documents to the extent they are within SKF's possession, custody, or control.

**14. Provide all reports filed by any of the entities defined above as "Peer" with any federal, state or local government agency from June 25, 2008 to date.**

**OBJECTION:**    SKF objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence.

**RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: No responsive documents are within SKF's possession, custody, or control. Further, to the extent that there are any responsive documents and they are publicly available, the burden of obtaining the documents is substantially the same for Claimants as it is for SKF.

**15. Provide all documents concerning by-laws, policies and procedures in place after June 25, 2008 at any of the entities defined above as "SKF" and "Peer" concerning indemnification of officers and directors.**

**OBJECTION:**    SKF objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. SKF further objects to this Request as overly broad and unduly burdensome to the extent that it seeks documents relating to the undefined and vague term "policies and procedures."

**RESPONSE:**    Subject to and without waiver of the Objection set forth above, SKF responds as follows: SKF will produce responsive, non-privileged documents to the extent they are within SKF's possession, custody, or control.

**16. Provide all schedules and exhibits appended to the Peer Acquisition Agreement.**

**OBJECTION:**    RBC previously requested production of the documents sought by this Request, and SKF objected on the grounds of relevance and confidentiality. In response to a motion to compel filed by RBC, the Panel held that RBC is not entitled to the requested production. *See* N.T. (11/23/2010) at 219-220 (Judge Pratt noting that the Panel "couldn't see any conceivable relevance to" the "exhibits to the [SKF/Peer SPA]" and denying RBC's request for production of those documents). In light of the Panel's prior ruling, SKF objects to producing documents responsive to this Request.

**17. Provide all ancillary documents executed in connection with the completion of the Peer Acquisition Agreement.**

-21-

**OBJECTION:** RBC previously requested production of the documents sought by this Request, and SKF objected on the grounds of relevance and confidentiality. In response to a motion to compel filed by RBC, the Panel held that RBC is not entitled to the requested production. *See* N.T. (11/23/2010) at 219-220 (Judge Pratt noting that the Panel "couldn't see any conceivable relevance to" the "exhibits to the [SKF/Peer SPA]" and denying RBC's request for production of those documents). In light of the Panel's prior ruling, SKF objects to producing documents responsive to this Request.

**18. Provide all by-laws, articles of incorporation and rules adopted by the boards of directors for any of the entities described above as "SKF" and "Peer."**

**OBJECTION:** SKF objects to this Request since it is not confined to the relevant time period and seek documents relating to the undefined and vague term "rules." In addition, SKF objects to this Request as unduly burdensome and duplicative in that seeks information previously sought by Request 15. The repetitive nature of Claimants' Requests is abusive.

**RESPONSE:** Subject to and without waiver of the Objection set forth above, SKF responds as follows: SKF will produce the following responsive, non-privileged documents to the extent that they are within SKF's possession, custody, or control: (1) SKF's by-laws and articles of incorporation; and (2) Peer's by-laws and articles of incorporation.

**19. Provide the organizational chart for any entities defined above as "Peer" and "SKF" since June 25, 2008.**

**OBJECTION:** SKF objects to this Request on the grounds that it seeks production of documents that are neither relevant to the parties' claims/defenses nor reasonably calculated to lead to the discovery of admissible evidence. SKF also objects to this Request to the extent that it requests production of documents that are not within SKF's possession, custody, or control.

**RESPONSE:** Subject to and without waiver of the Objection set forth above, SKF responds as follows: As the information contained in the documents sought by this Request is in large part irrelevant to the parties' claim/defenses in this Arbitration, SKF is unwilling to produce the requested documents. SKF is willing to confer with RBC regarding the scope of this Request and work with RBC to determine if there are less burdensome means for providing the discovery that RBC seeks.

**20. Provide all reports filed by any of the entities defined above as "SKF" with any federal, state or local government agency from June 25, 2008 to date, that reference any of the entities described above as "Peer."**

**RESPONSE:** No responsive documents are within SKF's possession, custody, or control.

**21. Provide all documents concerning any integration plans between SKF and Peer in connection with SKF's acquisition of Peer.**

-22-

**RESPONSE:**      None have ever existed.

**22. Provide all documents relied upon in answering the above interrogatories.**

**OBJECTION:**    SKF objects to this Request to the extent that it seeks documents protected from disclosure by the attorney-client privilege, the common-interest or community-of-interest privilege, and/or the work-product doctrine.

**RESPONSE:**      Subject to and without waiver of the Objection set forth above, SKF responds as follows: In preparing responses to Claimants' Interrogatories, SKF relied on (1) documents previously produced in this Arbitration and (2) documents identified on the privilege log that SKF served on RBC in September 2010. SKF will not reproduce documents previously produced to RBC, other than the copy of the SKF/Peer SPA that bears the designation "Attorneys' Eyes Only." Nor will it produce from its privilege log documents that the Panel has already determined are not subject to discovery. *See* N.T. (11/23/2010) at 234. Subject to the parties agreeing to an amendment to the Stipulated Confidentiality Order that provides for suitable limitations on the dissemination of highly confidential business information, all other non-privileged documents that SKF relied upon in responding to Claimants' Interrogatories will be produced.

## SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION

**1.      Admit that SKF could control the marketing and sale of Peer Bearings since June 25, 2008.**

**RESPONSE:**      Denied.  SKF specifically denies that it could control the marketing and sale of Peer bearing products since September 11, 2008. AB SKF, the parent company of SKF and the ultimate parent company of Peer, has instructed SKF and Peer that they are to function as competitors in the bearing market with regards to the marketing and sale of bearing products.  As such, SKF cannot be involved with Peer's business operations relating to the marketing and sale of Peer bearing products.

**2.  Admit that SKF could control the business practices associated with the marketing, sale, design and engineering of Peer Bearings since June 25, 2008.**

**OBJECTION:**    SKF objects to this Request for Admission as being unnecessarily duplicative of Request for Admission No. 1. The repetitive nature of Claimants' Requests for Admission is abusive.

**RESPONSE:**      Subject to and without waiver of the Objection set forth above, SKF responds as follows: Denied.  SKF specifically denies that it could control the business practices associated with the marketing, sale, design, and engineering of Peer bearing products since September 11, 2008. SKF incorporates by reference, as if fully set forth herein, its Response to Request for Admission 1.

**3.  Admit that SKF could control the content of Peer's website (http://www.peerbearing.com/) since June 25, 2008.**

-23-

**OBJECTION:** SKF objects to this Request for Admission as being unnecessarily duplicative of Requests for Admission 1 and 2. The repetitive nature of Claimants' Requests for Admission is abusive.

**RESPONSE:** Subject to and without waiver of the Objection set forth above, SKF responds as follows: SKF denies that it could control the content of Peer's website before or after the effective date of its acquisition of Peer, having been instructed by its parent that SKF and Peer are to function as competitors in the bearing market with regards to the marketing and sale of bearing products. As a result of such instruction, SKF cannot influence Peer's business operations relating to the marketing and sale of Peer bearing products, including the marketing content contained on Peer's website.

4. Admit that SKF could control the litigation strategy in the matter of *Peer Bearing Company v. RBC Bearings Inc.,* Opp. No. 91171191 (T.T.A.B. filed May 31, 2006).

**RESPONSE:** SKF admits that it could have controlled Peer's litigation strategy in the TTAB proceedings from and after September 11, 2008, and denies that it could have controlled Peer's litigation strategy before that date.

5. Admit that SKF could control the litigation strategy in the matter of *RBC Nice Bearings, Inc. v. Peer Bearing Company,* No. 3:06-CV-1380-VLB (D. Conn.).

**RESPONSE:** SKF admits that it could have controlled Peer's litigation strategy in RBC's 2006 lawsuit against Peer from and after September 11, 2008, and denies that it could have controlled Peer's litigation strategy before that date.

6. Admit that since June 25, 2008, SKF has made business decisions affecting the marketing and sale of Peer Bearings.

**RESPONSE:** Denied.

7. Admit that since June 25, 2008, SKF has made business decisions affecting the business practices concerning the marketing and sale of Peer Bearings.

**RESPONSE:** Denied.

8. Admit that SKF has made decisions affecting the litigation strategy in the matter of *Peer Bearing Company v. RBC Bearings Inc.,* Opp. No. 91171191 (T.T.A.B. filed May 31, 2006).

**RESPONSE:** Admitted.

9. Admit that SKF has made decisions affecting the litigation strategy in the matter of *RBC Nice Bearings, Inc. v. Peer Bearing Company,* No. 3:06-CV-1380-VLB (D. Conn.).

**RESPONSE:** Admitted.

-24-

#14519585 v5

10. Admit that since June 25, 2008, SKF has controlled the content of Peer's website (http://www.peerbearing. com/).

RESPONSE:    Denied.

11. Admit that since June 25, 2008, SKF has done nothing to stop Peer from continuing to post on its website the link "RBC VS Bearing Industry" (http://www.peerbearing.com/n_fn.asp).

RESPONSE:    Admitted.

12. Admit that since June 25, 2008, SKF has done nothing to stop Peer from opposing RBC's trademark applications pending before the USPTO.

RESPONSE:    Admitted.

13. Admit that since June 25, 2008, SKF has done nothing to stop Peer from continuing to sell Peer Bearings with the SERIES product designations.

RESPONSE:    Admitted.

14. Admit that since June 25, 2008, SKF has provided assistance to Peer, concerning the marketing and sale of Peer Bearings containing the SERIES product designations.

RESPONSE:    Denied.

15. Admit that since June 25, 2008, SKF has provided assistance to Peer, concerning Peer's oppositions to RBC's trademark applications pending before the USPTO.

OBJECTION:    SKF objects to this Request for Admission to the extent that it seeks information protected from disclosure by the attorney-client privilege, the common-interest or community-of-interest privilege, and/or the work-product doctrine. SKF further objects to this Request for Admission as vague, ambiguous, and confusing to the extent that it seeks information regarding the undefined and vague term "assistance."

RESPONSE:    Subject to and without waiver of the Objection set forth above, SKF responds as follows: Admitted.

16. Admit that since June 25, 2008, SKF has owned 100% of the Peer stock.

RESPONSE:    Admitted. See Response to Interrogatory 23.

-25-

**17. Admit that SKF has the power to remove members of Peer's Board of Directors.**

    <u>RESPONSE:</u>    Admitted.

_David Richman_

David Richman
Matthew D. Janssen
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
Tel: 215.981.4000
Fax: 215.981.4750

Dated: July 15, 2011        *Counsel for SKF USA Inc.*

-26-

#14519586 v5

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| IN THE ARBITRATION BETWEEN | : |
| | : |
| RBC NICE BEARINGS, INC., ROLLER | : |
| BEARING COMPANY OF AMERICA, | : |
| INC., and ROLLER BEARING COMPANY | : |
| OF AMERICA, d/b/a NICE BALL | : |
| BEARINGS, INC. | : |
| | : |
|                                    Claimants, | :      Case No. 14 152 01622 09 |
| | : |
| | : |
|                    and | : |
| | : |
| SKF USA INC., | : |
| | : |
|                              Respondent. | : |
| | : |

### VERIFICATION

      I, JANE K. WEBBER, ESQ., hereby state that I am Associate General Counsel and Assistant Secretary of SKF USA Inc., and as such am authorized to make this statement on behalf of Respondent. I am informed and therefore aver that the statements made in the foregoing RESPONDENT SKF USA INC.'S OBJECTIONS AND RESPONSES TO CLAIMANTS' SUPPLEMENTAL DISCOVERY REQUESTS are based upon information and records of SKF USA Inc. furnished to me by others and are true and correct to the best of my knowledge, information, and belief.

                                               _____
                                        Jane K. Webber, Esq.

Executed on July 8, 2011

## AMERICAN ARBITRATION ASSOCIATION

IN THE ARBITRATION BETWEEN⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
RBC NICE BEARINGS, INC., ROLLER⠀⠀⠀:
BEARING COMPANY OF AMERICA,⠀⠀⠀:
INC., and ROLLER BEARING COMPANY⠀:
OF AMERICA, d/b/a NICE BALL⠀⠀⠀⠀⠀⠀:
BEARINGS, INC.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:⠀⠀Case No. 14 152 01622 09
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Claimants,⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀and⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
SKF USA INC.,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Respondent.⠀⠀:
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀:

## PROOF OF SERVICE

⠀⠀⠀⠀⠀On July 15, 2011, a true and correct copy of the foregoing RESPONDENT SKF
USA INC.'S OBJECTIONS AND RESPONSES TO CLAIMANTS' SUPPLEMENTAL
DISCOVERY REQUESTS was served on all counsel of record via email.

⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀/s/ Matthew D. Janssen
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀Matthew D. Janssen

#1451958v5

# EXHIBIT K

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**

DUNN

Mailed:   July 5, 2012

Opposition No. 91171191
Opposition No. 91176823
Opposition No. 91176837
Opposition No. 91176848
Opposition No. 91176851

Peer Bearing Company

v.

RBC Bearings

**Elizabeth A. Dunn, Attorney (571-272-4267):**

On April 27, 2012, in response to opposer's request for resumption, applicant moved for termination of this consolidated opposition based on the arbitration award.  On May 14, 2012, opposer objected to applicant's characterization of the arbitrator's award.

Pursuant to Fed. R. Civ. P. 56(f), the Board notifies the parties that applicant's filing is construed as a motion for summary judgment on the ground that the arbitration award bars opposer from bringing its claims.  There is no requirement for either party to supplement its filing.  However, in case the parties wish to supplement their papers, applicant is allowed until THIRTY DAYS from the mailing date of this order to file

1

any supplement to its motion for summary judgment, and opposer is allowed until THIRTY DAYS from the date of service of applicant's supplement to file its own supplement.

If applicant does not supplement its motion for summary judgment but opposer wishes to supplement its opposition thereto, opposer's filing is due SIXTY days from the mailing date of this order.

With respect to Trademark Rule 2.127 which sets the Board's page limits for motions, any supplementary filing should indicate whether it is a replacement for the earlier filing, which will then be given no consideration, or a supplement, which should be read in conjunction with the earlier filing.

Proceedings herein are suspended pending disposition of applicant's motion for summary judgment.

Any paper filed during the pendency of this motion which is not relevant thereto will be given no consideration.  See Trademark Rule 2.127(d).

®®®®®

# EXHIBIT L

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

------------------------------------------------------------

| | |
|---|---|
| Peer Bearing Company, | ) Consolidated Opposition No. 91171191 |
| Opposer, | ) |
| | ) Opposition No. 91171191 (Appl. No. 78535213) |
| v. | ) Opposition No. 91176823 (Appl. No. 78745178) |
| | ) Opposition No. 91176837 (Appl. No. 78754894) |
| Roller Bearing Company of America, Inc. | ) Opposition No. 91176848 (Appl. No. 78754907) |
| | ) Opposition No. 91176851 (Appl. No. 78754876) |
| Applicant | ) |
| | ) Attorney Docket No. 1001-0007-1 |

## APPLICANT'S MOTION FOR SUSPENSION OF THE
## SUMMARY JUDGMENT PROCEEDING

Applicant hereby moves the Board to immediately suspend the pending Summary Judgment proceeding, based upon Applicant's petition to disqualify Opposer's attorney pursuant to 37 CFR §11.19(c), that has been submitted contemporaneously herewith.

On July 5, 2012, the Board issued an Order notifying the parties that the Board has initiated Summary Judgment proceedings in the present opposition based upon an April 27, 2012 submittal by the Applicant. In the Order, the Board suspended the proceedings and set a thirty day deadline for Applicant to file its Brief and allowed opposer thirty days from the service date of Applicants Brief, to file its brief.

The Board's procedures (TBMP §513.02) state that "[w]hen a petition to disqualify is filed in connection with a proceeding pending before the Board, the Board immediately issues an action suspending proceedings in the case."

On July 10, 2012, Applicant's Attorney, John Mutchler, participated in a telephone conference with the Board's Attorney Elizabeth Dunn, who indicated that the U.S. PTO would immediately suspend the Summary Judgment proceeding, including the deadlines for the parties' briefs, after receipt of a Motion to disqualify Opposer's attorney. However, Attorney Dunn requested that Applicant file a Motion to Suspend the Summary Judgment proceedings and request an oral telephonic hearing on the same. Attorney Dunn indicated that she would grant the telephonic oral hearing and follow with a prompt Order, accordingly. On July 12, 2012, the Board issued an Order, which stated, inter alia, that "if a motion to disqualify is filed, applicant is urged to inform the Board promptly with a phone call." Applicant has submitted a Motion for an Oral Telephonic Hearing on Applicant's Motion to Disqualify, contemporaneously herewith.

Based on the foregoing, Applicant respectfully requests that the Board immediately suspend the Summary Judgment proceeding and continue the suspension of Consolidated Opposition No. 91171191, pending a ruling on Applicant's petition to disqualify Opposer's attorney.

In addition, Applicant respectfully requests that the Board reset the deadlines for filing Briefs in the Summary Judgment proceeding (i.e., reinstate the 30 day time period for Applicant to submit its brief in the summary Judgment Proceeding), when the Board rules on Applicant's present Motion to Disqualify.

Date:  July 24, 2012          /John H. Mutchler
                              John H. Mutchler, Reg No. 53,362
                              Michaud-Kinney Group LLP
                              306 Industrial Park Road, Suite 206
                              Middletown, CT 06457
                              Phone: 860-632-7200
                              Fax: 860-632-8269
                              Email: mutchler@mkgip.com
                              Attorney for Applicant

## CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2012 a copy of the foregoing Applicant's Motion for Suspension of the Summary Judgment Proceeding was filed electronically via the ESTTA system and was served on counsel for Opposer, by sending same via United States Postal Service, postage pre-paid, First Class Mail, addressed to:

Thomas C. McDonough
Neal, Gerber & Eisenberg LLP
2 N. LaSalle St., Suite 1700
Chicago, IL 60602


/John H. Mutchler/

John H. Mutchler

Registration No. 53,362
Michaud-Kinney Group LLP
306 Industrial Park Road, Suite 206
Middletown, CT 06457
Phone: 860-632-7200
Fax: 860-632-8269
Email: mutchler@mkgip.com
Attorney for Applicant

*Trademark Trial and Appeal Board Electronic Filing System. http://estta.uspto.gov*

ESTTA Tracking number: **ESTTA485210**

Filing date: **07/24/2012**

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
### BEFORE THE TRADEMARK TRIAL AND APPEAL BOARD

| | |
|---|---|
| Proceeding | 91171191 |
| Party | Defendant<br>RBC Bearings |
| Correspondence<br>Address | RICHARD R MICHAUD<br>MICHAUD-DUFFY GROUP LLP<br>306 INDUSTRIAL PARK ROAD, SUITE 206<br>MIDDLETOWN, CT 06457<br>UNITED STATES<br>engel@michaud-duffy.com, thompson@michaud-duffy.com,<br>mutchler@mkgip.com |
| Submission | Other Motions/Papers |
| Filer's Name | John H. Mutchler |
| Filer's e-mail | mutchler@mkgip.com |
| Signature | /John H. Mutchler/ |
| Date | 07/24/2012 |
| Attachments | 1001-0007-1 Motion for Suspension of the Summary Judgment Proceeding.pdf (<br>3 pages )(29033 bytes ) |

# EXHIBIT M

**UNITED STATES PATENT AND TRADEMARK OFFICE**
Trademark Trial and Appeal Board
P.O. Box 1451
Alexandria, VA  22313-1451

DUNN

Mailed:  July 26, 2012

Opposition No. 91171191
Opposition No. 91176823
Opposition No. 91176837
Opposition No. 91176848
Opposition No. 91176851

Peer Bearing Company

v.

RBC Bearings

**Elizabeth A. Dunn, Attorney (571-272-4267):**

Proceedings herein are suspended pending disposition of applicant's petition, filed July 24, 2012, to disqualify counsel for opposer from representation of opposer in this consolidated proceeding.[1]  Any paper filed during the pendency of this petition which is not relevant thereto will be given no consideration.  See Trademark Rule 2.127(d). The petition will be forwarded to the Chief Administrative Trademark Judge for action.

Upon resumption, a briefing schedule for the motion for summary judgment will be reset.

---

[1]   This order makes moot applicant's July 24, 2012 motions to suspend proceedings and for an oral hearing on the motion to suspend.

# EXHIBIT N

AO 88 (11/910 Subpoena in a Civil Case

# United States District Court

## FOR THE EASTERN DISTRICT OF PENNSLYVANIA

Peer Bearing Company

    Plaintiff,

           V.

Roller Bearing Company of America, Inc.

    Defendant.

**SUBPOENA IN A CIVIL CASE**
IN THE TRADEMARK TRIAL AND APPEAL
BOARD

CIVIL CASE NO. 91171191

TO:    Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, 19103-2799

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
|  | DATE AND TIME |

☒  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. The deposition will be recorded by a stenographer.

| PLACE OF DEPOSITION<br>Veritext<br>1801 Market Street, Suite 1800, Philadelphia, PA 19103 | DATE AND TIME<br>August 29, 2012, 10 am |
| --- | --- |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or object):

**SEE ATTACHED SCHEDULE A**

| PLACE<br>Veritext<br>1801 Market Street, Suite 1800, Philadelphia, PA 19103 | DATE AND TIME<br>August 24, 2012 |
| --- | --- |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>_(signature)_    Attorney for Defendant | DATE<br>August 3, 2012 |
| --- | --- |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**John H. Mutchler, Esq.; Michaud-Kinney Group LLP**
306 Industrial Park Road, Suite 206, Middletown, CT 06457-1532

AO 88 (11/91) Subpoena in a Civil Case

---

## PROOF OF SERVICE

|  | DATE | PLACE |
|---|---|---|
| SERVED |  |  |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
|  |  |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
|  |  |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
    Date

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

  (1)  A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

  (2)(A)  A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at that place of production or inspection unless commanded to appear for deposition, hearing or trial.

  (B)  Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

  (3)(A)  On timely motion, the Court by which a subpoena was issued shall quash or modify the subpoena if it:

    (i)  fails to allow reasonable time for compliance;

    (ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transaction business

in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

    (iii)  requires disclosure of privileged or other protected material and no exception or waiver applies, or

    (iv)  subject a person to undue burden.

  B.  If a subpoena

    (i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

    (ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

    (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonable compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

  (1)  A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize the label them to correspond with the categories in the demand.

  (2)  When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# SCHEDULE A

## INSTRUCTIONS

1.    Produce all documents in a form that renders the documents susceptible to copying. Produce all documents as they are kept in the usual course of business or organized and labeled to correspond to the following Requests.

2.    If you are unable to comply fully with any request herein, comply to the extent possible and explain why full compliance is not possible.

3.    If any requested document or thing is unavailable because it has been destroyed, identify it (for documents, by date, author, addressee, signatory, subject and length); state when it was destroyed and why; and identify any person who destroyed it or who ordered it destroyed.

4.    Produce all material in your possession, custody or control, or within the possession, custody or control of your agents, servants, employees, related companies and attorneys. Produce all material in the possession, custody or control, or within the possession, custody or control of those firms, corporations, partnerships, or trusts that you control, and to material in the possession, custody or control of employees, agents, next friends, trustees, guardians and representatives of such entities.

5.    Any requested material that is withheld on the basis of a claim of privilege, work product, or any other ground is to be identified in writing by title, addressee, addresser, date, topic covered, and length. Additionally, provide a statement of the ground alleged for withholding each such document and identify all persons who have or have had possession, custody, or control of the document (or any portions thereof).

6.    For each document withheld on the basis of attorney client privilege, work product doctrine, or other privilege or immunity, provide an explicit identification of the document, the basis for withholding production of the document and state the author or authors of the document, all recipients of the document the date of creation of the document, a general summary of the contents of the document and any other information necessary to evaluate the basis for withholding production.

## DEFINITIONS

As used herein, the following terms have the following definitions:

1.  "SKF USA Inc." or "SKF" means SKF USA, Inc. of Lansdale, PA. and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.

2.  "Peer Bearing Company" or "Peer" means Peer Bearing Company of Waukegan, IL or Lansdale, PA and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.

3.  "Person" or "persons" shall mean any individual, association, trust, fiduciary, partnership, corporation, firm, organization, or legal or business entity.

4.  "Document" or "writing"" means every original and every non-identical copy of any original of all mechanically written, handwritten, typed or printed material, electronically stored data, e-mail, microfilm, microfiche, sound recordings, films, photographs, slides, and other physical objects of every kind and description containing stored information, including, but not limited to, all transcripts, letters, notes, memoranda, tapes, records, telegrams, periodicals, pamphlets, brochures, circulars, advertisements, leaflets, reports, research studies, test data, working papers, drawings, maps, sketches, diagrams, blueprints, graphs, charts, diaries, logs, agreements, contracts, rough drafts, analyses, ledgers, inventories, financial information, books of accounts, understandings, minutes of meetings, minute books, resolutions, assignments, computer printouts, purchase orders, invoices, bills of lading, written memoranda or notes of oral communications, and other tangible things of whatever nature.

5.  When referring to documents, the term "identify" shall mean to provide, to the extent known: the (i) type of documents; (ii) general subject matter; (iii) date of the document; (iv) name or title (or, if none, to otherwise describe) of the document; and (v) author(s), addressee(s) and recipient(s) of the document.

6.  "Communication" or "communications" means all meetings, conversations, conferences, discussions, correspondence, messages, telegrams, telefax, mailgrams, e-mail and all oral and written expressions or other occurrences whereby thoughts, opinions or data are transmitted between two or more persons.

7.    "Describe" means to state with specificity all facts, including but not limited to time, comprising or pertaining to such facts, thing, condition, action or event, and to identify all persons involved in such fact, thing, action or event.

8.    "Oral communication" means any verbal conversation or other statement from one person to another, including but not limited to any interview, conference, meeting or telephone conversation.

9.    "Refer," referring to," relate," or "relating to," means having a legal, factual or logical connection, relationship, correlation, or association with the subject matter of the Request.

10.    "Or" means "and/or" and words in the singular shall be construed to mean the plural or vice versa.

11.    "The Arbitration" means American Arbitration Association Case No. 14 152 01622 09, RBC NICE BEARINGS, INC. and ROLLER BEARING COMPANY OF AMERICA, INC. and ROLLER BEARING COMPANY OF AMERICA, INC. d/b/a NICE BALL BEARINGS, INC. v. SKF USA, INC.

12.    "Peer's Consolidated Oppositions" means the oppositions individually and Oppositions collectively, initiated by Peer against RBC's marks pending before the U.S. PTO as follows:
1600 SERIES Opposition No. 91171191;
600 SERIES  Opposition No. 91176823;
7600 SERIES Opposition No. 91176837;
6900 SERIES Opposition No. 91176848; and
7500 SERIES Opposition No. 91176851.

13.    "NGE" means the law firm of Neal, Gerber & Eisenberg, LLP of 2 N. LaSalle St., Suite 1700, Chicago, IL 60602, or other locations.

14.     "Applicant" means Roller Bearing Company of America, Inc. or RBC Bearing Inc. of Oxford, CT and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.

15.     "Pepper Hamilton" or "you" means the designated partner(s) of the law firm of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, 19103-2799, or other locations.

## Request for Documents

The documents and things requested herein or copies thereof are to be produced at the location and on the date specified above.

1.      All correspondence between SKF or Pepper Hamilton and any person acting for on behalf of or for the benefit of Peer, regarding any of Peer's Consolidated Oppositions and/or any opposition pending at any time before the USPTO or litigation matter involving the Applicant.

2.      All documents relating to any claim or waiver of common interest privilege associated with or related to documents shared between SKF or Pepper Hamilton and Peer or communications between SKF or Pepper Hamilton and Peer, in the Arbitration or any civil litigation matter and/or any opposition pending at any time before the USPTO involving the Applicant, including but not limited to transcripts of hearings before the Arbitration panel Judges and any orders or decisions issued thereby.

3.      All documents relating to any claim or waiver of privilege associated with or related to documents shared between SKF or Pepper Hamilton and Peer or communications between SKF or Pepper Hamilton and Peer, in the Arbitration, any civil litigation matter or any opposition pending at any time before the U.S. PTO involving the Applicant, including but not limited to transcripts of hearings before the Arbitration panel Judges and any orders or decisions issued thereby.

4.      All documents relating to SKF's control and ownership of Peer, including but not limited to documents relating to Peer's activities and SKF's control and ownership of Peer and/or policies applicable to Peer as an operating business of or subsidiary of SKF or as a member of the SKF group of companies.

5.      All documents relating to engagement of, review, approval or payments to Pepper Hamilton for SKF's legal expenses associated with the Arbitration, Peer's Consolidated Oppositions or any opposition pending at any time before the USPTO involving the Applicant.

6.      All documents, including all correspondence between Peer or NGE and Pepper Hamilton on or after April 4, 2012, including but not limited to documents and correspondence between Pepper Hamilton and attorneys Thomas C. McDonough and Thomas E. Williams, and their law firm Neal, Gerber & Eisenberg, LLP.

7.      All documents, including all correspondence between Peer or NGE and Pepper Hamilton before April 4, 2012, including but not limited to documents and correspondence between Pepper Hamilton and attorneys Thomas C. McDonough and Thomas E. Williams, and their law firm Neal, Gerber & Eisenberg, LLP.

8.      All documents, including all correspondence between Peer and SKF or Pepper Hamilton on or after April 4, 2012.

9.      All documents, including all correspondence between Peer and SKF or Pepper Hamilton before April 4, 2012.

10.      All documents relating to the Arbitration, including but not limited to documents relating to hearing transcripts, e-mails, discovery, Arbitration Panel Orders and communicators with the Arbitration Panel or any Arbitration Judge.

11.      All documents relating to engagement of, review, approval or payment for legal services rendered by Pepper Hamilton for Peer including but not limited to invoices and documents relating to payment for the legal services.

12.      All documents relating to any Pepper Hamilton policy concerning a conflict of interest and waivers thereof in the representation of clients.

AO 88 (11/910 Subpoena in a Civil Case

# United States District Court

## FOR THE EASTERN DISTRICT OF PENNSLYVANIA

**Peer Bearing Company**

    **Plaintiff,**

               V.

**Roller Bearing Company of America, Inc.**

    **Defendant.**

### SUBPOENA IN A CIVIL CASE
IN THE TRADEMARK TRIAL AND APPEAL BOARD

CIVIL CASE NO. 91171191

TO:    David Richman of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, 19103-2799

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. The deposition will be recorded by a stenographer.

| PLACE OF DEPOSITION<br>Veritext<br>1801 Market Street, Suite 1800, Philadelphia, PA 19103 | DATE AND TIME<br>August 29, 2012, 1 pm |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or object):

**SEE ATTACHED SCHEDULE A**

| PLACE<br>Veritext<br>1801 Market Street, Suite 1800, Philadelphia, PA 19103 | DATE AND TIME<br>August 24, 2012 |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>Attorney for Defendant | DATE<br><br>August 3, 2012 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**John H. Mutchler, Esq.; Michaud-Kinney Group LLP**
**306 Industrial Park Road, Suite 206, Middletown, CT 06457-1532**

AO 88 (11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                              Date

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)   A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A)   A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at that place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B)   Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A)   On timely motion, the Court by which a subpoena was issued shall quash or modify the subpoena if it:

(i)   fails to allow reasonable time for compliance;

(ii)   requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transaction business

in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)   requires disclosure of privileged or other protected material and no exception or waiver applies, or

(iv)   subject a person to undue burden.

B.   If a subpoena

(i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)   requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)   requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonable compensated, the court may order appearance or production only upon specified conditions.

(d)   DUTIES IN RESPONDING TO SUBPOENA.

(1)   A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize the label them to correspond with the categories in the demand.

(2)   When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## INSTRUCTIONS

1.     Produce all documents in a form that renders the documents susceptible to copying. Produce all documents as they are kept in the usual course of business or organized and labeled to correspond to the following Requests.

2.     If you are unable to comply fully with any request herein, comply to the extent possible and explain why full compliance is not possible.

3.     If any requested document or thing is unavailable because it has been destroyed, identify it (for documents, by date, author, addressee, signatory, subject and length); state when it was destroyed and why; and identify any person who destroyed it or who ordered it destroyed.

4.     Produce all material in your possession, custody or control, or within the possession, custody or control of your agents, servants, employees, related companies and attorneys. Produce all material in the possession, custody or control, or within the possession, custody or control of those firms, corporations, partnerships, or trusts that you control, and to material in the possession, custody or control of employees, agents, next friends, trustees, guardians and representatives of such entities.

5.     Any requested material that is withheld on the basis of a claim of privilege, work product, or any other ground is to be identified in writing by title, addressee, addresser, date, topic covered, and length.  Additionally, provide a statement of the ground alleged for withholding each such document and identify all persons who have or have had possession, custody, or control of the document (or any portions thereof).

6.     For each document withheld on the basis of attorney client privilege, work product doctrine, or other privilege or immunity, provide an explicit identification of the document, the basis for withholding production of the document and state the author or authors of the document, all recipients of the document the date of creation of the document, a general summary  of the contents of the document and any other information necessary to evaluate the basis for withholding production.

## DEFINITIONS

As used herein, the following terms have the following definitions:

1.      "SKF USA Inc." or "SKF" means SKF USA, Inc. of Lansdale, PA. and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.

2.      "Peer Bearing Company" or "Peer" means Peer Bearing Company of Waukegan, IL or Lansdale, PA and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.

3.      "Person" or "persons" shall mean any individual, association, trust, fiduciary, partnership, corporation, firm, organization, or legal or business entity.

4.      "Document" or "writing"" means every original and every non-identical copy of any original of all mechanically written, handwritten, typed or printed material, electronically stored data, e-mail, microfilm, microfiche, sound recordings, films, photographs, slides, and other physical objects of every kind and description containing stored information, including, but not limited to, all transcripts, letters, notes, memoranda, tapes, records, telegrams, periodicals, pamphlets, brochures, circulars, advertisements, leaflets, reports, research studies, test data, working papers, drawings, maps, sketches, diagrams, blueprints, graphs, charts, diaries, logs, agreements, contracts, rough drafts, analyses, ledgers, inventories, financial information, books of accounts, understandings, minutes of meetings, minute books, resolutions, assignments, computer printouts, purchase orders, invoices, bills of lading, written memoranda or notes of oral communications, and other tangible things of whatever nature.

5.      When referring to documents, the term "identify" shall mean to provide, to the extent known: the (i) type of documents; (ii) general subject matter; (iii) date of the document; (iv) name or title (or, if none, to otherwise describe) of the document; and (v) author(s), addressee(s) and recipient(s) of the document.

6.      "Communication" or "communications" means all meetings, conversations, conferences, discussions, correspondence, messages, telegrams, telefax, mailgrams, e-mail and all oral and written expressions or other occurrences whereby thoughts, opinions or data are transmitted between two or more persons.

7.      "Describe" means to state with specificity all facts, including but not limited to time, comprising or pertaining to such facts, thing, condition, action or event, and to identify all persons involved in such fact, thing, action or event.

8.      "Oral communication" means any verbal conversation or other statement from one person to another, including but not limited to any interview, conference, meeting or telephone conversation.

9.      "Refer," referring to," relate," or "relating to," means having a legal, factual or logical connection, relationship, correlation, or association with the subject matter of the Request.

10.     "Or" means "and/or" and words in the singular shall be construed to mean the plural or vice versa.

11.     "The Arbitration" means American Arbitration Association Case No. 14 152 01622 09, RBC NICE BEARINGS, INC. and ROLLER BEARING COMPANY OF AMERICA, INC. and ROLLER BEARING COMPANY OF AMERICA, INC. d/b/a NICE BALL BEARINGS, INC. v. SKF USA, INC.

12.     "Peer's Consolidated Oppositions" means the oppositions individually and Oppositions collectively, initiated by Peer against RBC's marks pending before the U.S. PTO as follows:
1600 SERIES Opposition No. 91171191;
600 SERIES  Opposition No. 91176823;
7600 SERIES Opposition No. 91176837;
6900 SERIES Opposition No. 91176848; and
7500 SERIES Opposition No. 91176851.

13.     "NGE" means the law firm of Neal, Gerber & Eisenberg, LLP of 2 N. LaSalle St., Suite 1700, Chicago, IL 60602, or other locations.

14.     "Applicant"  means Roller Bearing Company of America, Inc. or RBC Bearing Inc. of Oxford, CT  and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.

15.     "Pepper Hamilton" or "you" means the designated partner(s) of the law firm of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, 19103-2799, or other locations.

**Request for Documents**

The documents and things requested herein or copies thereof are to be produced at the location and on the date specified above.

1.      All correspondence between SKF or you and any person acting for on behalf of or for the benefit of Peer, regarding any of Peer's Consolidated Oppositions and/or any opposition pending at any time before the USPTO or litigation matter involving the Applicant.

2.      All documents relating to any claim or waiver of common interest privilege associated with or related to documents shared between SKF or you and Peer or communications between SKF or you and Peer, in the Arbitration or any civil litigation matter and/or any opposition pending at any time before the USPTO involving the Applicant, including but not limited to transcripts of hearings before the Arbitration panel Judges and any orders or decisions issued thereby.

3.      All documents relating to any claim or waiver of privilege associated with or related to documents shared between SKF or you and Peer or communications between SKF or you and Peer, in the Arbitration, any civil litigation matter or any opposition pending at any time before the U.S. PTO involving the Applicant,  including but not limited to transcripts of hearings before the Arbitration panel Judges and any orders or decisions issued thereby.

4.      All documents relating to SKF's control and ownership of Peer, including but not limited to documents relating to Peer's activities and SKF's control and ownership of Peer and/or policies applicable to Peer as an operating business of or subsidiary of SKF or as a member of the SKF group of companies.

5.      All documents relating to engagement of, review, approval or payments to Pepper Hamilton for SKF's legal expenses associated with the Arbitration, Peer's Consolidated Oppositions or any opposition pending at any time before the USPTO involving the Applicant.

6.      All documents, including all correspondence between Peer or NGE and you on or after April 4, 2012, including but not limited to documents and correspondence between you and attorneys Thomas C. McDonough and Thomas E. Williams, and their law firm Neal, Gerber & Eisenberg, LLP.

7.      All documents, including all correspondence between Peer or NGE and you before April 4, 2012, including but not limited to documents and correspondence between you and attorneys Thomas C. McDonough and Thomas E. Williams, and their law firm Neal, Gerber & Eisenberg, LLP.

8.      All documents, including all correspondence between Peer and SKF or you on or after April 4, 2012.

9.      All documents, including all correspondence between Peer and SKF or you before April 4, 2012.

10.     All documents relating to the Arbitration, including but not limited to documents relating to hearing transcripts, e-mails, discovery, Arbitration Panel Orders and communicators with the Arbitration Panel or any Arbitration Judge.

11.     All documents relating to engagement of, review, approval or payment for legal services rendered by Pepper Hamilton for Peer including but not limited to invoices and documents relating to payment for the legal services.

12.     All documents relating to any Pepper Hamilton policy concerning a conflict of interest and waivers thereof in the representation of clients.

AO 88 (11-910 Subpoena in a Civil Case

# United States District Court

## FOR THE EASTERN DISTRICT OF PENNSLYVANIA

Peer Bearing Company

    **Plaintiff,**

              V.

Roller Bearing Company of America, Inc.

    **Defendant.**

**SUBPOENA IN A CIVIL CASE**
IN THE TRADEMARK TRIAL AND APPEAL
BOARD

CIVIL CASE NO. 91171191

TO:    Matthew D. Janssen of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, 19103-2799

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case. The deposition will be recorded by a stenographer.

| PLACE OF DEPOSITION<br>Veritext<br>1801 Market Street, Suite 1800, Philadelphia, PA 19103 | DATE AND TIME<br>August 29, 2012, 3 pm |
|---|---|

☒    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or object):

### SEE ATTACHED SCHEDULE A

| PLACE<br>Veritext<br>1801 Market Street, Suite 1800, Philadelphia, PA 19103 | DATE AND TIME<br>August 24, 2012 |
|---|---|

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>Attorney for Defendant | DATE<br><br>August 3, 2012 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**John H. Mutchler, Esq.; Michaud-Kinney Group LLP**
306 Industrial Park Road, Suite 206, Middletown, CT 06457-1532

AO 88 (11/91) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                     Date

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at that place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the Court by which a subpoena was issued shall quash or modify the subpoena if it:

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transaction business

in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected material and no exception or waiver applies, or

(iv) subject a person to undue burden.

B. If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonable compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize the label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## SCHEDULE A

## INSTRUCTIONS

1.     Produce all documents in a form that renders the documents susceptible to copying. Produce all documents as they are kept in the usual course of business or organized and labeled to correspond to the following Requests.

2.     If you are unable to comply fully with any request herein, comply to the extent possible and explain why full compliance is not possible.

3.     If any requested document or thing is unavailable because it has been destroyed, identify it (for documents, by date, author, addressee, signatory, subject and length); state when it was destroyed and why; and identify any person who destroyed it or who ordered it destroyed.

4.     Produce all material in your possession, custody or control, or within the possession, custody or control of your agents, servants, employees, related companies and attorneys. Produce all material in the possession, custody or control, or within the possession, custody or control of those firms, corporations, partnerships, or trusts that you control, and to material in the possession, custody or control of employees, agents, next friends, trustees, guardians and representatives of such entities.

5.     Any requested material that is withheld on the basis of a claim of privilege, work product, or any other ground is to be identified in writing by title, addressee, addresser, date, topic covered, and length.  Additionally, provide a statement of the ground alleged for withholding each such document and identify all persons who have or have had possession, custody, or control of the document (or any portions thereof).

6.     For each document withheld on the basis of attorney client privilege, work product doctrine, or other privilege or immunity, provide an explicit identification of the document, the basis for withholding production of the document and state the author or authors of the document, all recipients of the document the date of creation of the document, a general summary of the contents of the document and any other information necessary to evaluate the basis for withholding production.

## DEFINITIONS

As used herein, the following terms have the following definitions:

1.      "SKF USA Inc." or "SKF" means SKF USA, Inc. of Lansdale, PA. and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.


2.      "Peer Bearing Company" or "Peer" means Peer Bearing Company of Waukegan, IL or Lansdale, PA and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.


3.      "Person" or "persons" shall mean any individual, association, trust, fiduciary, partnership, corporation, firm, organization, or legal or business entity.


4.      "Document" or "writing"" means every original and every non-identical copy of any original of all mechanically written, handwritten, typed or printed material, electronically stored data, e-mail, microfilm, microfiche, sound recordings, films, photographs, slides, and other physical objects of every kind and description containing stored information, including, but not limited to, all transcripts, letters, notes, memoranda, tapes, records, telegrams, periodicals, pamphlets, brochures, circulars, advertisements, leaflets, reports, research studies, test data, working papers, drawings, maps, sketches, diagrams, blueprints, graphs, charts, diaries, logs, agreements, contracts, rough drafts, analyses, ledgers, inventories, financial information, books of accounts, understandings, minutes of meetings, minute books, resolutions, assignments, computer printouts, purchase orders, invoices, bills of lading, written memoranda or notes of oral communications, and other tangible things of whatever nature.


5.      When referring to documents, the term "identify" shall mean to provide, to the extent known: the (i) type of documents; (ii) general subject matter; (iii) date of the document; (iv) name or title (or, if none, to otherwise describe) of the document; and (v) author(s), addressee(s) and recipient(s) of the document.


6.      "Communication" or "communications" means all meetings, conversations, conferences, discussions, correspondence, messages, telegrams, telefax, mailgrams, e-mail and all oral and written expressions or other occurrences whereby thoughts, opinions or data are transmitted between two or more persons.

7.     '"Describe" means to state with specificity all facts, including but not limited to time, comprising or pertaining to such facts, thing, condition, action or event, and to identify all persons involved in such fact, thing, action or event.

8.     "Oral communication" means any verbal conversation or other statement from one person to another, including but not limited to any interview, conference, meeting or telephone conversation.

9.     "Refer," referring to," relate," or "relating to," means having a legal, factual or logical connection, relationship, correlation, or association with the subject matter of the Request.

10.     "Or" means "and/or" and words in the singular shall be construed to mean the plural or vice versa.

11.     "The Arbitration" means American Arbitration Association Case No. 14 152 01622 09, RBC NICE BEARINGS, INC. and ROLLER BEARING COMPANY OF AMERICA, INC. and ROLLER BEARING COMPANY OF AMERICA, INC. d/b/a NICE BALL BEARINGS, INC. v. SKF USA, INC.

12.     "Peer's Consolidated Oppositions" means the oppositions individually and Oppositions collectively, initiated by Peer against RBC's marks pending before the U.S. PTO as follows:
1600 SERIES Opposition No. 91171191;
600 SERIES  Opposition No. 91176823;
7600 SERIES Opposition No. 91176837;
6900 SERIES Opposition No. 91176848; and
7500 SERIES Opposition No. 91176851.

13.     "NGE" means the law firm of Neal, Gerber & Eisenberg, LLP of 2 N. LaSalle St., Suite 1700, Chicago, IL 60602, or other locations.

14.     "'Applicant" means Roller Bearing Company of America, Inc. or RBC Bearing Inc. of Oxford, CT and its employees, agents, officers, directors, legal representatives, predecessor(s), assigns, as well as any affiliates, and any other related company.

15.     "Pepper Hamilton" or "you" means the designated partner(s) of the law firm of Pepper Hamilton LLP, 3000 Two Logan Square, Eighteenth and Arch Streets, Philadelphia, Pennsylvania, 19103-2799, or other locations.

## Request for Documents

The documents and things requested herein or copies thereof are to be produced at the location and on the date specified above.

The documents and things requested herein or copies thereof are to be produced at the location and on the date specified above.

1.      All correspondence between SKF or you and any person acting for on behalf of or for the benefit of Peer, regarding any of Peer's Consolidated Oppositions and/or any opposition pending at any time before the USPTO or litigation matter involving the Applicant.

2.      All documents relating to any claim or waiver of common interest privilege associated with or related to documents shared between SKF or you and Peer or communications between SKF or you and Peer, in the Arbitration or any civil litigation matter and/or any opposition pending at any time before the USPTO involving the Applicant, including but not limited to transcripts of hearings before the Arbitration panel Judges and any orders or decisions issued thereby.

3.      All documents relating to any claim or waiver of privilege associated with or related to documents shared between SKF or you and Peer or communications between SKF or you and Peer, in the Arbitration, any civil litigation matter or any opposition pending at any time before the U.S. PTO involving the Applicant,  including but not limited to transcripts of hearings before the Arbitration panel Judges and any orders or decisions issued thereby.

4.      All documents relating to SKF's control and ownership of Peer, including but not limited to documents relating to Peer's activities and SKF's control and ownership of Peer and/or policies applicable to Peer as an operating business of or subsidiary of SKF or as a member of the SKF group of companies.

5.      All documents relating to engagement of, review, approval or payments to Pepper Hamilton for SKF's legal expenses associated with the Arbitration, Peer's Consolidated Oppositions or any opposition pending at any time before the USPTO involving the Applicant.

# EXHIBIT O

# Pepper Hamilton LLP
#### Attorneys at Law

3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
215.981.4000
Fax 215.981.4750

Matthew D. Janssen
direct dial: 215.981.4527
janssenm@pepperlaw.com

August 20, 2012

*Via Facsimile (860.632.8269) and First Class Mail*

John H. Mutchler, Esq.
Michaud-Kinney Group LLP
306 Industrial Park Road, Suite 206
Middletown, CT 06457-1532

Re:   Peer Bearing Company v. Roller Bearing Company of America, Inc.
Case No. 91171191, Trademark Trial and Appeal Board

Dear Mr. Mutchler:

I write regarding the subpoenas that you issued to Pepper Hamilton LLP, David Richman, Esq., and me in the above-referenced consolidated opposition proceedings. Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, Pepper Hamilton LLP, Mr. Richman, and I submit the enclosed objections to the subpoenas. Further, as you and your client have failed to take any steps to avoid imposing unreasonable and undue burden and expense upon Pepper Hamilton LLP, Mr. Richman, and me, your issuance of the subpoenas invites the imposition of monetary sanctions against you and RBC under Rule 45(c)(1) and 28 U.S.C. § 1927, including that you reimburse Pepper Hamilton LLP, Mr. Richman, and me for all attorneys' fees, costs, and expenses incurred in connection with your objectionable subpoenas.

I would like to meet and confer with you regarding the subpoenas. Please contact me to let me know your availability.

Very truly yours,

Matthew D. Janssen

cc:   David Richman, Esq.

---

| Philadelphia | Boston | Washington, D.C. | Los Angeles | New York | Pittsburgh |
| Detroit | Berwyn | Harrisburg | Orange County | Princeton | Wilmington |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PEER BEARING COMPANY,        )
                                )
        Plaintiff,      )
                                )     Case No. 91171191
        v.             )
                                )     Pending in the Trademark Trial and
ROLLER BEARING COMPANY OF    )     Appeal Board
AMERICA, INC.,              )
                                )
        Defendant.     )
                                )

## OBJECTIONS TO SUBPOENAS SERVED ON PEPPER HAMILTON LLP, DAVID RICHMAN, ESQ. AND MATTHEW D. JANSSEN, ESQ.

Pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure, Pepper Hamilton LLP, David Richman, Esq., and Matthew D. Janssen, Esq., by and through undersigned counsel, hereby object to the subpoenas *ad testificandum* and *duces tecum* that Roller Bearing Company of America, Inc. ("RBC") issued to them in connection with the consolidated opposition entitled *Peer Bearing Company v. Roller Bearing Company of America, Inc.*, Case No. 91171191, which is pending before the Trademark Trial and Appeal Board ("TTAB"). Pepper Hamilton and attorneys Richman and Janssen object to the subpoenas on the following grounds:

1. Since the *Peer v. RBC* TTAB proceedings have been suspended at RBC's request, RBC is foreclosed at this time from issuing discovery subpoenas in connection with those proceedings. *See* Trademark Trial and Appeal Board Manual of Procedure § 403.01 (3d ed., Revision 1, June 2012) ("The traditional discovery devices, namely, discovery depositions, interrogatories, requests for production of documents and things, and requests for admission, are available for use only during the discovery period.").

#16579031 v1

2.      Since RBC, on April 27, 2012, filed in the *Peer v. RBC* TTAB proceedings papers that the TTAB is treating as a motion for summary judgment, it is evident that the discovery record in those proceedings is complete enough to support RBC's case-dispositive motion and that the subpoenas that RBC issued to Pepper Hamilton and attorneys Richman and Janssen in August 2012 are therefore unnecessary.

3.      The subpoena to Pepper Hamilton is facially defective since Pepper Hamilton is a Pennsylvania limited liability partnership and the subpoena to it does not set forth any matters for examination as required by Rule 30(b)(6) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 30(b)(6) ("In its notice or subpoena, a party may name as a deponent a [] partnership [and] must describe with reasonable particularity the matters for examination.").

4.      The subpoenas to Pepper Hamilton and attorneys Richman and Janssen seek the disclosure of information and materials protected from disclosure by the attorney-client privilege, common-interest or community-of-interest privilege, and the work product doctrine, including materials that the Panel in the arbitration entitled *RBC Nice Bearings, Inc., et al. v. SKF USA Inc.*, Case No. 14 152 01622 09 (American Arbitration Association) has already held are privileged and not subject to disclosure.

5.      The subpoenas to Pepper Hamilton and attorneys Richman and Janssen seek the disclosure of information and materials that SKF USA Inc. previously produced to RBC and vice versa in the arbitration entitled *RBC Nice Bearings, Inc., et al. v. SKF USA Inc.*, Case No. 14 152 01622 09 (American Arbitration Association) and need not be produced again.

#16579031 v1

6.      The subpoenas to Pepper Hamilton and attorneys Richman and Janssen seek the disclosure of information and materials that relate to a claim that has been decided against RBC in the arbitration entitled *RBC Nice Bearings, Inc., et al. v. SKF USA Inc.*, Case No. 14 152 01622 09 (American Arbitration Association) and that RBC is estopped from relitigating, namely, whether Peer Bearing Company, as SKF's subsidiary, is barred by a contract between RBC and SKF from opposing RBC's trademark registration applications.

7.      The subpoenas to Pepper Hamilton and attorneys Richman and Janssen are overbroad and impose an undue burden upon them.

8.      The subpoenas to Pepper Hamilton and attorneys Richman and Janssen seek production of information and materials that are wholly irrelevant to the *Peer v. RBC* TTAB proceedings.

Further, as RBC and its counsel at the Michaud-Kinney Group LLP have failed to take any steps to avoid imposing unreasonable and undue burden and expense upon Pepper Hamilton and attorneys Richman and Janssen in connection with the subpoenas, RBC and its counsel are subject to sanctions under Rule 45(c)(1) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927.

Dated:  August 20, 2012

David Richman
Matthew D. Janssen
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

*Counsel for Pepper Hamilton LLP, David Richman,
Matthew D. Janssen, and SKF USA Inc.*

-3-

#16579031 v1

## CERTIFICATE OF SERVICE

I, Matthew D. Janssen, hereby certify that on this 20th day of August, 2012, a true and correct copy of the foregoing was served via facsimile and U.S. First Class Mail, postage prepaid, upon the following:

> John H. Mutchler, Esq.
> Michaud-Kinney Group LLP
> 306 Industrial Park Road, Suite 206
> Middletown, CT 06457-1532
>
> *Counsel for Roller Bearing Company of America, Inc.*

_____
Matthew D. Janssen

# EXHIBIT P

# **MKG** MICHAUD-KINNEY GROUP LLP
## INTELLECTUAL PROPERTY LAW

*From the Desk of*

John H. Mutchler

Mutchler@mkgip.com
Tel. 860-632-7200
Fax 860-632-8269

Michaud-Kinney Group LLP
Intellectual Property Law
Centerpoint
306 Industrial Park Road
Suite 206
Middletown, CT  06457-1532
www.mkgip.com

*Attorneys at Law*
Richard R. Michaud (1963–2012)

Michael K. Kinney*±
John H. Mutchler*±
Elizabeth A. Galletta*◦±
Walter B. Welsh*◦±
Robert L. Rispoli *±
Elana A. Bertram *±
Christine W. Beninati*◦◊±

*Of Counsel*
Raymond D. Thompson*±
Peter J. Rainville ♦

± Admitted CT
†Admitted MA
*Admitted NY
◊Admitted PA
♦Admitted U.S. Patent
& Trademark Office

August 23, 2012

**<u>Via Email and Regular Mail</u>**

Mr. Matthew D. Janssen
Pepper Hamilton LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799

Re:   Peer Bearing Company v. Roller Bearing Company of America, Inc.
        Consolidated Opposition No. 91171191
        Before the Trademark Trial and Appeal Board
        (Our Docket No. 1001-0007-1)

Dear Mr. Janssen:

Thank you for your letter of August 20, 2012, regarding RBC's subpoenas of you, Pepper Hamilton LLP, and David Richman. We disagree with the positions and objections to the subpoenas raised in your letter of August 20, 2012. We will provide a substantive response to those objections shortly. We also disagree with the allegation that we have failed to take any steps to avoid imposing unreasonable and undue burden and expense on you, Mr. Richman and your firm. Please identify your basis for making this blanket allegation so that we may respond accordingly.

As you know, the deadline to produce documents in response to the subpoena is tomorrow, August 24, 2012. Please confirm whether or not the subpoenaed parties intend to produce documents on or before the date. To the extent you do not, we are postponing the depositions currently scheduled for August 29, 2012. We will reschedule the depositions after documents are produced.

Finally, we note that by letter of August 13, 2012 from Mr. Richman to me, we understand that Mr. Richman refused to accept service of a subpoena of SKF USA, Inc. Please confirm that this is accurate, and we will serve the subpoena on SKF.

Very truly yours,

Michaud-Kinney Group LLP

By _____
        John Mutchler

JHM/ntm
cc: David Richman, Esq.